BEATTY, Justice.
Appeal by the Alabama Public Service Commission and five protesting carriers from a circuit court order which reversed a decision of the Commission. We reverse and remand.
The case began with an application filed with the Commission by Lane Trucking, Inc. (Lane) to extend its existing operations as a common carrier. At that time Lane already had authority to transport a number of commodities, road materials and aggregate, between points south of a line beginning at the point at which U. S. Highway 11 crosses the Alabama-Mississippi boundary line, continuing along that highway to and including the Birmingham commercial zone, then eastward on U. S. Highway 78 to the Alabama-Georgia boundary line. That authority restricts service to “construction contractors and suppliers of construction contractors and construction, building or roadbuilding projects.” In its application to extend its authority Lane sought to: (1) add four commodities to its existing certificate (moss stone, clay, bauxite, and ore fines); (2) increase its existing operating territory by adding the upper orie-third of the state to its certificate;-and (3) remove the service restrictions noted above. Lane’s application was protested by Magic City Trucking Service (Magic City), Alabama Bulk Carriers, Inc. (ABC), Chem Haulers, Inc. (Chem), Weems Hauling, Inc. (Weems), and Coosada Trucking Company, Inc. (Coosada).
Initially the matter was orally heard by a hearing examiner on December 5, 1978, the protestants being present. A continued hearing followed on December 18, and at that hearing ten supporting witnesses testified. Lane did not submit shipper support for “ore fines” or “moss stone.” (The parties instruct us that “clay” and “bauxite” are one and the same commodity.) Briefs were filed with the examiner by the parties.
The examiner’s report, after making findings of fact, contained a recommendation that the application be granted in part, 1. e., that Lane be authorized to have its present commodities, plus “clay,” between points in its present territory and all points north thereof, and that the northern boundary of the existing territory be extended to the boundary of Jefferson County.
Lane and the protestants filed objections to the examiner’s order. The matter was submitted then to the entire Public Service Commission which, on May 23, 1979, entered its report concluding that Lane had failed to carry its burden of showing that the proposed operations were required by public convenience and necessity, and that the examiner’s recommendation was not supported by the evidence. The Commission denied Lane’s application. After considering a petition for reconsideration filed by Lane and a reply to it by the protestants, the Commission again denied Lane’s application, whereupon Lane appealed to the circuit court under Code of 1975, § 37-3-29. Extensive briefs were filed in that court. On June 4, 1980 the circuit court entered an order finding the recommendations of the examiner to be “just and reasonable and supported by sufficient evidence.” That court ordered the Commission to approve the hearing examiner’s recommendations. The Commission and the five protestants have appealed from that order.
Although the parties express the issues before us in different ways, they essentially *16 agree that the controlling issue is whether the Commission erred to the prejudice of Lane’s substantial rights in its application of the law; or whether the Commission’s order was based upon a finding of facts contrary to the substantial weight of the evidence. See Code of 1975, § 37-1-124.
The scope of our review of Public Service Commission orders has been expressed in numerous decisions. We are required by statute to take that order as prima facie just and reasonable. § 37-1-124. That order must be affirmed if it is supported by substantial evidence. Alabama Gas Corporation v. Wallace, 293 Ala. 594, 308 So.2d 674 (1975). A circuit court order based upon a review of the Commission’s order carries no presumption of correctness; we review that court’s order as though the appeal had been directly to this Court, Alabama Public Service Commission v. Chem-Haulers, Inc., 293 Ala. 677, 309 So.2d 453 (1975), and in exercising our review we must be mindful not to substitute our own judgment for that of the administrative authority. Hiller Truck Lines v. Alabama Public Service Commission, 292 Ala. 161, 290 So.2d 649 (1974).
Initially we consider the effect of the hearing examiner’s order upon the Commission’s later review.’ Was the Commission bound to accord to its examiner’s report a presumption of correctness? In Chem-Haulers, supra, the hearing examiner had taken evidence ore tenus and reached a conclusion which the Commission, which had made no findings of fact, later overruled. Following Alabama Public Service Commission v. Perkins, 275 Ala. 1, 151 So.2d 677 (1962), we held that because the examiner saw and heard the witnesses ore tenus and observed their demeanor, his report was entitled to “some favorable presumption.” We point out, however, that in Perkins and in Chem-Haulers, the evidence was conflicting on the issues presented.
In this case, however, we do not perceive any conflict in the evidence which would call the ore tenus rule into play. The two instances of alleged conflict in the evidence cited by the petitioner refer to testimony of Mr. Ben Mathews of Couch Construction Company, a witness for the petitioner. At one point he testified that his company had experienced problems with the service of Coosada; that on numerous occasions his company had asked for a certain number of trucks from Coosada which Coosada had not been able to provide. Mr. William Echols, the dispatcher for Coosada, did not dispute Mathews’s testimony, but did explain what had occurred, disclosing that there was not any conflict with Mathews testimony:
The only one that he would be talking about would be the haul in the past couple of months, just previously, at Dannelly Field, here in Montgomery, and they were resurfacing some of Dannelly Field; it’s on Highway 80 and sometime, I believe, they wanted a certain amount of trucks and, due to, maybe, they had trouble with their organization. They called and said they wanted a certain amount of trucks and another foreman would ask for a certain amount of trucks, and, you know, some communications problem, but the job was complete, I thought, and I thought it was a pretty good job.
The petitioner’s other assertion of a conflict in the evidence deals with the testimony of Mr. William Thornton of R & S Materials, who testified that he had contacted Coosada with regard to shipments to various points in north Alabama. We quote from his testimony:
Q Have you had any problems with motor carrier service?
A Not mainly, really problems. I guess — I don’t know what you call it. You call them and they say, “Well, I just can’t get there today.” I can understand that, you know, but sometimes it seems you get the same answer over and over all the time. And then you have got, you know, even though all you do is sell the material to the people, most of the people you sell do not have their own trucks, so therefore they are expecting you to hunt them up somebody to haul it for them. So, I try to hunt them up somebody and sometimes I am lucky and sometimes I say, “I just can’t find anybody to haul it.” So I just lose a sale on it.
*17 Q Does that happen very often?
A Several times this past year. I had some stuff I could have shipped into Huntsville and I couldn’t get it there.
Q. Have you had other customer requests for service:
A Yes, I had one going to Jasper, Alabama and I couldn’t get it there.
Q Did you attempt to contact carriers?
A Yes. I called one on that. They just couldn’t get around to it.
Q Who did you call?
A Coosada. I know it has been a busy year for everybody.
Q Who have you used on these shipments north of that line thus far?
A You mean to Gadsden? I used Coo-sada — I mean the only one I know could haul it up there.
Q Have you had any problems getting service on that?
A They said they were doing the best they could do ...
Mr. Echols also explained, but did not refute, this testimony:
Q Okay. Now, Mr. Thornton, I think, from R & S Materials was — testified as to a sale that he lost, I believe, in the Gadsden — Rainbow City area, where Coosada was either used to truck the sand up there, or didn’t have trucks available. Are you familiar with that incident?
A Yes, sir, the only thing that I could relate would probably be with one of our concrete customers in that area, who was several months behind with their bill, and we couldn’t haul any more material until they caught up with what they owed us. They have since done that, and we are hauling for them, and, I am sure, they are completely satisfied — no complaints.
Q That customer is who?
A Service Concrete.
We conclude, therefore, that no conflict exists in the evidence which would accord to the examiner’s report an ore tenus presumption. Moreover, and in contra-distinction to Perkins and Chem-Haulers, supra, the Commission in this case made detailed findings of fact, some of which were in addition to those made by the examiner.
Therefore we must determine whether the Commission’s order, which is prima fa-cie reasonable, is supported by substantial evidence.
In support of his application the petitioner presented eleven witnesses: C. B. Lane, Jr., C. T. Thackston, Ben Mathews, Joel Wilson, M. S. Hopper, Roy Asbell, Bill Campbell, Joseph Crocker, William P. Thornton, Jr., Jonathon E. Hightower, and Wayne Wallace. We summarize the relevant portions of their testimonies.
C. B. Lane, Jr., president and general manager of Lane Trucking, Inc., testified that Lane already is providing transportation services for exempt commodities (e. g., fertilizer) to points in north Alabama, although his equipment must “deadhead” (travel empty) from north Alabama to the northern boundary of his present authority. An extension, he testified, would cut down on his deadhead mileage. He also disclosed over 900 clay shipments his firm had handled under a trip-lease arrangement with ABC between January 1, 1978 through October 31,1978. His firm could provide more equipment if it held the authority itself. On cross-examination Lane acknowledged that exempt commodities carried by his firm to north Alabama averaged about ten hauls per month, and that all trucking businesses would experience an empty back-haul. He also conceded that there were at least two other licensed carriers presently possessing authority to haul clay-bauxite if shippers should call upon them.
Thackston, treasurer and general manager of C. T. Thackston Sand and Gravel, Inc. of Montgomery, testified that his firm’s plant is in Montgomery County, and ships sand and roofing gravel to Gadsden, Jasper and Huntsville. He sees a potential for additional business in north Alabama and hopes it will be as much as a twenty percent increase. He had thirty-five units of private equipment, and has operated up to one hundred trucks out of Montgomery. Availability of motor carrier equipment is a *18 problem, and on big orders he needs additional service, his own equipment being primarily set up for short hauls serving Montgomery and the surrounding area. On cross-examination Thackston testified that a “substantial portion” of his shipments outside Montgomery County fall within the present area of Lane’s authority, and that approximately ninety-five percent of all of his company’s sand and gravel shipments are delivered within Lane’s present authority. His north Alabama shipments comprised only about five percent of his revenue and “we are hoping that our business will go further north, but we don’t have the business at this time.” He had used Coosa-da in the past and still uses them somewhat, but had never used Magic City to service north Alabama even though he was aware of their authority. He would have no objection to using Magic City, Chem-Haulers or Alabama Bulk for his north Alabama loads.
Ben Mathews, vice-president of Couch Construction Company of Dothan, testified that his company operates ready-mix concrete and asphalt plants. He testified that his company on occasion had to shift raw materials sources during a job from points south of Lane’s authority line to points north of it, and that he foresaw handling future projects in north Alabama and would need dependable motor carrier service if that occurred. On cross-examination he revealed that in 1978 his company had not ordered any materials from the northern third of Alabama, nor had it shipped any materials to that area. His object in supporting Lane was in anticipation of obtaining jobs in north Alabama. He also testified that he would have no objection to using Magic City or Weems for hauling jobs in north Alabama.
Joel Wilson, vice-president of Didier-Tay-lor Refractories of Eufaula, testified concerning shipments of bauxite to Leeds and Ragland through the services of ABC, which in turn make trip-lease arrangements with Lane and Coosada for the actual hauling, with the invoices and paperwork being done by ABC. He stated that initially he had unsuccessfully contacted five or six motor carriers before contacting ABC, and that all of the service provided by ABC had been through the trip-lease arrangement with Lane, which had offered to provide additional service if its application was granted. Wilson understood that Coosada was giving good service in its hauling and he would have no objection to using Coosa-da. Further, on those occasions of difficulty in obtaining a sufficient number of trucks, both with Lane and Coosada, the occasions were based upon “spur of the moment” requests.
M. S. Hopper, president of an Andalusia firm involved in the business of highway paving, testified that his company had two jobs on 1-59 around Gadsden which involved slag shipments, and that he was bidding on additional work in that area. He also foresaw additional business north of the Birmingham area. Testifying about some company slag shipments by rail from Gadsden to a Houston County job, Hopper stated that he did not attempt to find any motor carrier service to haul this commodity even though he knew of several motor carriers which had the authority. He would have no objection to using Magic City, Weems, Coosada, and ABC, for shipments in the northern one-third of the state. He had had good service from Lane and supported its application in anticipation of new business in north Alabama where he hoped to use Lane because of their long business relationship, though he had no objection to using other licensed carriers.
Roy Asbell, sales manager for Wade Sand and Gravel Co., testified that his company produced crushed limestone at its Birmingham plant and sand and gravel from its Jemison quarry. Ninety-five percent of their shipments of stone are transported by truck, and most of this in the Jefferson County area. A small percentage, about one percent, would go to points north of Birmingham. He anticipated an increase in his business in the Jasper area, and would prefer to use Lane in the north Alabama points because of their long business relationship and Lane’s satisfactory service. Most of his customers arrange for their own *19 transportation; however, his company has used Magic City, Weems, and Lane. Concerning the availability of other carriers, Asbell testified:
Q Have you had problems with other, with existing motor carriers?
A No, we have had, you know, we haven’t had any trouble with any of them actually, except sometimes you call them and they don’t have any equipment available.
Yet he added that it was not unusual in the industry for a carrier on occasion to be unable to deliver a truck, and that the services of Coosada, Magic City and Weems have been reasonably satisfactory.
Bill Campbell, president of Southeast Materials, testified that his company had an exclusive contract to sell limestone from the Southern Ready-Mix quarry at Calera. They ship from Calera to a point near the Jefferson-Walker County line and into Greene and Pickens Counties. Southeast, requiring deliveries on a timed basis, has used Coosada, Southern Haulers, Prattville Haulers, and Magic City, and there had been occasions when he would not get enough equipment. His company sells sand and gravel out of Millbrook, and Campbell thought the same market in north Alabama would open in the near future. He added that the service of Coosada, Southern Haulers, Magic City, Weems and Bama Excavating for hauls to points north and west of Calera had been satisfactory, except for occasional needs for extra trucks. His support of Lane’s application was in anticipation of additional future business in north Alabama.
Joseph Crocker, sales representative for Southern Stone, a manufacturer of crushed stone, sand, gravel, and asphalt, testified that his company operated eight quarries in Alabama. The main plant, at Maylene, ships most of its product to South Alabama via Lane, Coosada, M & M, Magic City, Bama, and others. Some shipments were made to Pickens County. Most of their shipments required time deliveries, and his company had experienced some transportation problems from their Cherokee facility. He anticipated a switch from rail service, by which gravel is shipped. He testified that he had no problems with the existing carrier service from any of their locations except possibly the Cherokee location, but he had no problem in using other licensed carriers serving that site.
William P. Thornton, Jr., a sales representative for R & S Materials, a sand and gravel producer in Macon and Montgomery Counties, testified that as a salesman he had difficulty in getting materials hauled to Florence and Gadsden, although he had searched for motor carrier service. He stated that his company probably had lost some sand sales because of the absence of motor carrier service to north Alabama. He later testified that material to Florence was shipped by rail, and that he encountered difficulty on only one instance when he attempted to ship by truck, and the only carrier he contacted for that haul was Coo-sada. He did not know at that time that Magic City had authority. He didn’t remember whether he called M & M Trucking on his Jasper and Huntsville jobs, but he did call Coosada. He stated that he would have no objection to using Magic City, M & M, or any other licensed carrier.
Jonathon Hightower, office manager with Millbrook Sand and Gravel Company, which primarily serves concrete and asphalt customers, testified that his firm had been in business only several months and as yet had not shipped to points north of Birmingham. Nevertheless, Millbrook was preparing bids on two north Alabama projects. Occasionally they require carrier service on short notice. Presently Millbrook is using Lane, Coosada, Keith Williams, and G & S. Millbrook’s dump truck requirements are being substantially satisfied by these present shippers, and if north Alabama orders were forthcoming, Hightower would have no objection to using other carriers.
Wayne Wallace, sales representative with Vulcan Materials, testified to his familiarity with his company’s truck shipments of limestone, aggregate and slag from their Alabama plants, and explained that normally each plant served a given area, although *20 occasionally shipments would overlap due to production problems. He testified that in the materials business the demand for trucks fluctuated, and that on given times there would not be enough equipment available, yet existing motor carriers had been able to supply the needed equipment. Peak and slack periods for trucking demands, he stated, were due in large part to weather conditions. Vulcan’s north Alabama plants are served by “local” haulers who haul in the trade area of those particular plants, while Vulcan’s Calera plant, the crushed stone plant closest to south Alabama, makes more prevalent use of common carriers such as Magic City, Coosada, Weems, Keith Williams, and Southern Haulers. He had no objection to using Magic City, Coosada and some other carriers to haul the slag going south, although on one job Coosada, the only trucker called, could not handle a shipment from Gadsden to Houston County.
The protestants introduced evidence which tended to establish their readiness and ability to provide the necessary service to shippers.
Randy Luffman, director of tariffs and commerce for Chem-Haulers and ABC, testified to the equipment of Chem-Haulers, consisting of eighty truck tractors, as well as to these companies’ investment. Luff-man showed that ABC had authority to haul any commodity within the state, except cement, lime and mortar mix. He also showed by exhibit the revenues from shipments handled by Lane under its trip-lease arrangement with ABC. He noted that Chem’s eighty units are scattered throughout the thirty-two states within its authority, and that ABC operates only four units which are stationed in Birmingham. It was Luffman’s opinion that the grant of Lane’s application would result in a tremendous loss of revenue and greatly harm ABC.
George Roberts, general manager of Weems, testified that his company owned twenty-five trucks and also twenty to twenty-five leased units. He stated that their authority was virtually that applied for by Lane. Weems had occasionally trip-leased with ABC, usually for north Alabama shipments where Weems could operate under their own authority anyway, and also trip-leased with Magic City occasionally. Weems operates eighteen separate dump trucks and trailers. Roberts testified that his company could not handle a request for service from Vulcan Materials at Gadsden to Houston County.
Horace Theriot, the accountant and office manager for Coosada, verified exhibits showing Coosada’s authority and equipment consisting of between ninety and one hundred owned and operator-leased trucks and tractor-trailer units. He also authenticated a summary of Coosada’s sand and bauxite hauling from January 1978 through November 1978 to points north of Highways 11 and 78. Some of these shipments were shown to be within the Birmingham commercial zone which Lane has authority to serve. The exhibit also showed that approximately $200,000 in revenue was subject to diversion by Lane. Theriot’s opinion was that Coosada had sufficient equipment to satisfy shippers’ requirements from points south to north of Highways 11 and 78, although he did not know whether his company was providing service from the northern third of the state to south Alabama.
William F. Echols, Jr., vice-president and dispatcher of Coosada, testified that Coosa-da operated dump trucks throughout Alabama for all points and places, and that its equipment is designed to fill the need of the shipping public for that type equipment, and that Coosada had sufficient equipment to provide such service. He added that it has hauled for and the solicited business from Vulcan Materials, National Cement and Didier-Taylor, Thackston, Millbrook, Wade, Southern Stone, and R & S Materials. Coosada, he stated, rarely failed to provide equipment upon request, except when the call is made at the last minute.
Wallace Harper, secretary and office manager of Magic City Trucking Service of Birmingham, furnished exhibits which disclosed their equipment and accounts receivable. It was shown that the company employed one hundred ninety-four employees, *21 owned and operated thirty-four service trucks, owned and operated eleven tandem-axle dump trucks, thirty tandem tractors, sixty tri-axle dump trucks, thirty-one triaxle dump trailers, had between thirty-five and forty permanently leased units, and had available one hundred additional units. Harper testified that Magic City’s authority covered the entire state, and its authorized commodities included those sought by Lane.
Their accounts receivable exhibit disclosed Magic City’s customers, materials and destinations for hauls made in 1977, which were comparable for 1978. According to Harper, Magic City was ready, willing and able to serve all needs of the witnesses supporting Lane’s application, and was serving most of them already. In fact, he stated that seventy-five percent of Magic City’s hauling is one-way, i. e., without a back haul. Lane’s application, if approved, would have an adverse economic impact on Magic City which, Harper stated, for at least six months before the hearing had received no complaint from the witnesses for Lane, nor had Magic City turned down business from any of them.
Taking the evidence as a whole we have concluded that there is substantial evidence in the record supporting the Commission’s conclusion that Lane’s proposed operations were not required by public convenience and necessity. The evidence supports the conclusion that there is an overall adequate motor service to the territories sought in the application. Indeed, many of the supporting witnesses apparently had not shipped anything to north Alabama, and there was an absence of proof that any shipper could not get commodities shipped to north Alabama by existing facilities, especially since most of them had not contacted all of the available carriers because they were unaware of their authority. Much of the “need” for expanded service, it appears, was based upon the speculation that the economy would “open up” in north Alabama and ultimately result in additional demands for traffic. To counter this, the protestants established facts concerning transport availability of a substantial nature to the territory now sought by Lane.
The following statement contained in Alabama Public Service Commission v. Perkins, 275 Ala. 1, 4, 151 So.2d 627 (1963), is pertinent here:
Proof of public convenience and necessity requires an affirmative showing that the proposed operations are superior to those presently authorized carriers; or that the proposed operations will serve a useful purpose which cannot or will not be met by existing carriers....
We are convinced by a review of the entire record that the Commission’s assessment of the evidence was correct. Cf. Service Express, Inc. v. Baggett Transportation Co., 281 Ala. 666, 207 So.2d 418 (1968). Accordingly, the judgment of the trial court is reversed, and this cause is remanded to that court with directions to enter an order affirming the order of the Commission of May 23, 1979.
REVERSED AND REMANDED.
TORBERT, C. J., and SHORES and ADAMS, JJ., concur.
JONES, J., concurs in the result.