ALABAMA GAS CORPORATION

v.

George C. WALLACE, as Governor of the State of Alabama, et al.

LEE BROTHERS CORPORATION et al.

v.

ALABAMA GAS CORPORATION.

SC 712, SC 712X.

Supreme Court of Alabama.

Jan. 16, 1975.

Rehearing Denied March 6, 1975.

T. B. Hill, Jr., Robert C. Black, Montgomery, and Douglas Arant, Macbeth Wagnon, Jr., Thad G. Long, Birmingham, for appellants and cross-appellees.

Maurice F. Bishop, Birmingham, for Hon. George C. Wallace, as Governor of Ala., and State of Ala.

Oliver W. Brantley, Troy, for the Five Corporate Intervenors.

**FAULKNER, Justice.**

On February 2, 1971, the Alabama Gas Corporation (ALAGASCO) filed an application with the Alabama Public Service Commission (Commission) under and pursuant to § 53, Title 48, Code of Alabama 1940, Recompiled 1958, seeking an increase of $5,312,000 per year in its schedule of rates and charges for supplying natural gas to the public. ALAGASCO proposed to make the new schedule of rates and charges as amended effective April 5, 1971. The Commission suspended operation of the proposed new rates and charges through June 4, 1971, and set the application for public hearing to commence on April 14, 1971, and notice of the hearing was given to ALAGASCO, The State of Alabama, and to the agencies affected by the proposed rate increase. Publicity was given of the application and the date and place of the hearing through newspaper accounts. The State of Alabama, Hon. George C. Wallace, as Governor, the Department of Defense of the United States of America, Lee Brothers Corportaion,

National Gypsum Company, Tape-Craft, Inc., Indian Head Yarn & Thread, F.M.C. Corporation, Kilby Steel Division, Monsanto Company, and others filed petitions to intervene, and their intervention was permitted under § 65, Title 48.

Hearings commenced on April 14, 1971, and ALAGASCO presented evidence in support of the proposed new rates. Cross-examination of witnesses for ALAGASCO, the intervenors' evidence, and rebuttal evidence were concluded May 29, 1971.

On June 4, 1971, the Commission issued its opinion and order denying ALAGASCO's proposed rate increase as originally filed, and ordered ALAGASCO to file new schedules of rates calculated to produce a return of 7.25% on the fair value rate base under § 52, Title 48, or 8.3% under Act 97, Acts of Alabama, 1971, Vol. I, p. 171. (The dollar amounts of the two rate bases were not set out in the Commission's order.) In doing so, the Commission reduced ALAGASCO'S requested increase from $5,312,000 to $3,822,000. New schedules of rates in compliance with the Commission's order were filed by ALAGASCO on June 10, 1971. The Commission gave its approval on June 10, 1971, by a majority composed of Commissioners Owen and Connor. Commissioner Juanita McDaniel allowed an annual increase of revenue of $1,408,170. She found that a rate of return of 7.89% was reasonable. She also found a rate base of $76,817,663, which was computed under the provisions of Act 97.

The intervenors appealed the Commission's orders of June 4, 1971 and June 10, 1971, to the Circuit Court of Montgomery County. On August 14, 1973, the Circuit Court directed the Commission to file with the court a memorandum prepared from the certified record, without taking additional testimony, explaining how the Commission arrived at the rate base, and rate of return, and a detailed finding of the increase granted by the Commission. On September 14, 1973, a memorandum was

filed by Commissioner Owen. Commissioner Connor, the other member of the majority, died before the filing of the memorandum. Commissioner Hammond, who succeeded Connor on the Commission, declined to become involved in the proceedings.

Excerpts from the memorandum filed by Commissioner Owen with the Circuit Court showing the rate base and rate of return computations are set out in the Appendix to this opinion.

During the proceedings in the Circuit Court, the court permitted the taking of testimony of Commissioner McDaniel, Commission Secretary Tidmore, and Commission employee Williams over the objection of ALAGASCO. Furthermore, the court received into evidence, over objection of ALAGASCO, an affidavit by the intervenors. This affidavit concerned a financing transaction of $815,000 of a Liquified Natural Gas facility of ALAGASCO, which occurred after the close of the test year involved in the rate investigation. ALAGASCO says the affidavit was newly discovered evidence prohibited by statute. However without waiving its objection to the introduction of the intervenors, ALAGASCO filed a rebuttal affidavit.

The Circuit Court found that the June 4, 1971, order of the Commission was not supported by substantial evidence in the certified record. The court set aside the order and adopted the dissenting opinion of Commissioner McDaniel as its own. The case was remanded to the Commission with directions to fix new rates for ALAGASCO resulting in a reduction of its annual revenues of $2,413,830. The court disallowed attorneys' fees, taxed the costs against ALAGASCO, and held that ALAGASCO was not required to make refunds.

From the final decree of the Circuit Court, ALAGASCO appeals to this court. And, in accordance with the ruling of this court on March 7, 1974, ALAGASCO filed its supersedeas bond with the Circuit Court and it was duly approved. The intervenors argue on cross-appeal that refunds should be paid. The issue of attorneys' fees was not orally argued.

ALAGASCO, in its argument to this court, argues three propositions of law: (1) the order of the Circuit Court reaches this court without any presumption of correctness, and the Commission's order is reviewed in this court as though the appeal had been directly and primarily to this court; (2) the order of the Commission is presumed to be just and reasonable; and (3) the Commission's order should be affirmed if there is substantial evidence to support it. On the cross-appeal the intervenors argue that refunds should be ordered, and allowance of attorneys' fees.

The proceedings on appeal to the Circuit Court from the Commission are governed by § 82, Title 48, Code of Alabama 1940 (Recompiled 1958). This statute provides that the Commission's order shall be taken as prima facie just and reasonable. In Alabama Public Service Commission v. Nunis, 252 Ala. 30, 39 So.2d 409 (1949), this court said:

"On appeal to this Court, we must review the judgment of the circuit court without any presumption of its correctness, since that court was in no better position to review the order of the Commission than we are . . . We are governed by the same rules in our review as was the circuit court. So that we will review the order of the commission as though the appeal from the commission's order had been directly and primarily to this Court."

See State of Alabama v. Southern Bell Telephone & Telegraph Co., 274 Ala. 288, 148 So.2d 229 (1962); Alabama Public Service Commission v. Southern Railway Co., 269 Ala. 63, 111 So.2d 214 (1959). Our review in this case boils down to the question of whether the order of the Commission which shall be taken as prima facie just and reasonable, is supported by

substantial evidence in the certified record. On appeal the burden is upon one who would upset the order of the Commission to establish that the evidence does not sustain the conclusion reached by the Commission. Illinois Central R. Co. v. Thomas Alabama Kaolin Co., 275 Ala. 236, 153 So. 2d 794 (1963).

## THE RATE BASE

The Commission computed the rate base under the fair value method and under Act 97, amending § 52, Title 48. We will be concerned only with Act 97, as this Act supercedes § 52, Title 48, and is applicable in this case.

Act 97 provides:

"For the purpose of fixing rates such reasonable value of a public utility's property shall be deemed to be the *original cost thereof, less the accrued depreciation, as of the most recent date available, and the amount of the new investment to be added in the year immediately following the test period used in arriving at the value of such utility's property.*" (Emphasis added.)

ALAGASCO'S evidence (Schedule J–1, Ex. # 23) showed that the original cost of its property as of September 30, 1970, was $107,214,141. The depreciation reserve was $33,432,185. Therefore, the original cost less depreciation as of the most recent date available, shows the reasonable value of the utility's property to be $73,781,956 ($107,214,141 minus $33,432,185). The amount of new investment to be added in the year immediately following the test period is shown by ALAGASCO'S Exhibit # 43, to be $8,610,000. The Commission deducted $200,000 (rounded figure) from the projected new investment. This amount is said to be highway reimbursements. The majority arrived at a rate base of $80,346,000 under Act 97. The majority's computation can be viewed in the Appendix to this opinion.

The minority found a rate base of $76,817,663 by starting with net plant of $73,781,956; adding an allowance of materials and supplies of $963,304; new investment of $5,410,000 ($8,610,000 minus $3,200,000), and subtracting highway reimbursements of $200,140 and 1971 accrued depreciation of $3,137,457. It is contended by the intervenors that $3,200,000 should be deducted from the amount of $8,610,000 shown by Exhibit # 43 introduced by ALAGASCO, as the sum of $3,200,000 would be used to serve new customers. We do not interpret what the legislature said in that light. The Act provides, "and the amount of the new investment to be added in the year following the test period." This language is interpreted to include the total investment to be added rather than a portion thereof.

We observe from the record that the Commission majority required ALAGASCO to file new rates to take into consideration the additional customers to be added during the year following the test year. By doing so, the majority accomplished the same end result as the minority did in eliminating $3,200,000 from new investment to be added.

We find no basis for accruing depreciation as found by the minority. The words in the statute, "the accrued depreciation, as of the most recent date available" are taken to mean accrued depreciation on the *original cost of the plant property devoted to serving the public with natural gas as of the close of the test year,* and before addition of new investments.

When the accrued depreciation, deducted by the minority, is added back to the minority's computation of the rate base, the minority's rate base is in close proximity to the majority rate base. In other words, disallowing the adjustment for accrued depreciation, the minority's rate base would be $79,955,120, compared with a rate base of $80,346,970 found by the majority. No

consideration is given to the allowance by the minority of $963,304 for materials and supplies. If this item were included, the adjusted rate base of the minority would exceed the majority's rate base.

◼ The intervenors argued that the sum of $815,000, the cost of an L.N.G. plant, should be taken from the cost of new investment. The evidence in this issue was submitted to the Circuit Court by affidavits by both sides. One side said the L.N.G. was not constructed—the other said it was. There was error in admitting these affidavits. Section 82, Title 48 provides that "[n]o new or additional evidence may be introduced in the circuit court except as to fraud or misconduct."

◼ We are of the opinion, after reviewing the record, that the Commission's order establishing a rate base of $80,346,970, was supported by substantial evidence. Consequently, in view of the well established principle that the Commission's order must be affirmed if there is substantial evidence to support it, we approve the Commission's rate base. Cf. North Alabama Motor Express v. Rookis, 244 Ala. 137, 12 So.2d 183 (1943); Alabama Electric Cooperative, Inc. v. Alabama Power Co., 274 Ala. 332, 148 So.2d 613 (1963); Floyd & Beasley Transfer Co., Inc. v. Alabama Public Service Commission, 276 Ala. 130, 159 So.2d 833 (1963).

RATE OF RETURN

◼ The rate of return involves: (1) Cost of debt capital; (2) Cost of equity capital; and (3) Cost of preferred stock.

◼ The cost of debt capital was 6.93% while the cost of preferred stock was 4.-70%. These figures are not in dispute. The cost of equity capital was disputed. ALAGASCO'S witness testified the return an equity capital should be 13.5%. The intervenor's witness testified the return on

equity capital should be somewhere between 10.21% and 10.89%. The Commission majority arrived at a rate of return of 12.09% on equity capital. This appears to be a compromise on the part of the majority. Since this is a judgmental matter based on conflicting evidence, we are of the opinion the Commission's finding should be upheld by this court. The conflicting evidence presented an issue to be resolved by the Commission. *Alabama Electric Cooperative, Inc.*

The Commission majority found a rate of return of 8.3% on an Act 97 rate base of $80,347,000. Act 97 provides:

" . . . In any determination of the commission as to what constitutes such a fair return, the commission shall give due consideration, among other things, to the requirements of the business with respect to the utility under consideration, and the necessity, under honest, efficient and economical management of such utility, of enlarging plants, facilities and equipment of the utility under consideration, in order to provide that portion of the public served thereby with adequate service."

◼ The determination of a fair return to provide the public with adequate service is a question of fact within the legislative realm of rate making. Here the Commission majority took into account the cost of debt, preferred stock, a 12.09% return on equity capital, and arrived at a rate return of 8.3%.

◼ The rate of return in any given case calls for expert judgment not bound by any hard and fast rule or set formula. That judgment has been entrusted by the legislature to the Commission. This court's inquiry goes no further than to ascertain whether there is evidence to support the findings of the Commission. Birmingham Electric Company v. Alabama Public Service Commission, 254 Ala. 140,

47 So.2d 455 (1949); City of Birmingham v. Southern Bell Telephone & Telegraph Co., 234 Ala. 526, 176 So. 301 (1937). In our opinion the evidence supports the rate of return found by the Commission.

## OPERATING REVENUES and OPERATING INCOME

■ The operating income produced on an Act 97 rate base of $80,347,000 and a rate return of 8.3% is $6,668,800. The adjusted operating income found for the test year was $4,699,244. Therefore, the return on the Commission's rate base was $1,969,556 more than the adjusted operating income. ALAGASCO requested an increase in operating income of $2,600,750. (To produce this increase in operating income, ALAGASCO said it would have to receive $5,312,000 in additional pre-tax revenue.) The Commission majority allowed an increase of operating income of $1,969,556, a reduction of $631,194 from ALAGASCO'S request. An addition of $124,000 of operating income from new customers produced a total reduction of $755,194. The reduction in operating revenue by the Commission was $1,492,000. This reduction corresponded to the $755,194 reduction of operating income after applying a tax factor of 0.50615 ($755,194 divided by .50615 equals $1,492,000). Reducing the requested operating revenues of $5,312,000 by $1,492,000, the Commission granted an increase in operating revenue of $3,820,000. The major adjustment in dispute in this item which materially affected the end result was the weather adjustment, the difference being adjustment based on Birmingham temperatures by the intervenors' evidence, and adjustment based on state-wide temperatures by ALAGASCO'S evidence. The Commission majority accepted ALAGASCO'S evidence in arriving at its finding. This court stated in *Alabama Electric Cooperative, Inc.*:

"We do not weigh the conflicts in the evidence but accept as true those tenden-

cies of the evidence and reasonable inferences to be drawn therefrom which tend to support the action taken by the Commission."

The increase in operating revenue granted by the Commission majority is approved, as there is substantial evidence in the record to support the increase.

## FINDINGS OF FACT

There were no findings of fact by the Commission, but this court has held in previous cases before it that it is unnecessary for the Commission to make any findings. Alabama Public Service Commission v. Higginbotham, 256 Ala. 621, 56 So.2d 401 (1951); City of Birmingham v. Southern Bell Telephone & Telegraph Co., 234 Ala. 526, 176 So. 301 (1937). In *Higginbotham* this court said:

"Since there was no finding of facts by the Commission, in considering the question of whether the Commission erred in applying the law to the facts, we must consider the evidence in the light most favorable to the upholding of the order of the Commission, and without weighing the conflicting evidence. In other words, we do not weigh the conflicts in the evidence, but accept as true those tendencies of the evidence and the reasonable inferences to be drawn therefrom which tend to support the action taken by the Commission."

To the contrary notwithstanding, a finding of facts is most helpful in a review of a rate case.

We pretermit discussion of the remaining assignments of error found in ALAGASCO'S brief, as they are unnecessary for disposition of this case.

## THE REFUND AND ATTORNEYS' FEE ISSUES

■ Since we are of the opinion that there is substantial evidence in the certi-

fied record to affirm the order of the Commission, these issues in essence become moot. But, to answer the intervenors, the rates collected between the Commission's June 4, 1971, order and the decree of the Circuit Court, were lawful rates. These were the only rates ALAGASCO could collect as they were fixed after an investigation by the Commission. And, in the absence of a supersedeas authorized by § 81, Title 48, ALAGASCO was compelled by law to charge and collect those rates. T. R. Miller Mill Co. v. Louisville and N. R. Co., 207 Ala. 253, 92 So. 797 (1921). See also Birmingham Electric Co. v. Alabama Public Service Commission, 254 Ala. 140, 47 So.2d 455 (1949).

■ Attorneys' fees are disallowed under authority of State of Alabama and George C. Wallace, as Governor of the State of Alabama et al. v. Alabama Public Service Commission, 293 Ala. 553, 307 So. 2d 521.

The decree of the Circuit Court setting aside the Commission's order is reversed and the case is remanded with direction to enter an order affirming the findings of the Public Service Commission. That part of the decree disallowing refunds and attorneys' fees is affirmed.

Affirmed in part, reversed in part, and remanded.

MERRILL, COLEMAN, HARWOOD, BLOODWORTH, MADDOX and McCALL, JJ., concur.

HEFLIN, C. J., concurs in the result.

JONES, J., concurs in the result.

### APPENDIX

"3. The *fair value* rate base was arrived at as follows:

"Company witness Jones presented a fair value rate base (Exhibit 23) of $94,200,000 by weighting equally (⅓ each) three components: (1) original cost; (2) reproduction cost; and (3) invested capital. Original cost and reproduction cost were reduced by deducting from working capital in each case an additional $868,000 (over and above $444,055 already deducted by the Company (Exhibit 12, line 1) in computing its working capital requirements shown on line 14 of Exhibit 23 and on Exhibit 8) for federal and state income taxes, and by deducting also the amount of $21,430 of accrued payroll taxes as suggested by Intervenor's witness Drazen (Exhibit 50, Schedule 10, page 3, line 7), for a total of $889,430. The invested capital component was also reduced $3,659,000 by the Commission majority so as to use actual September 30, 1970 capitalization rather than capitalization adjusted to reflect long-term financing done by the Company in January, 1971. (Compare last lines, columns 3 and 5, Exhibit 1.)

"In addition, since the Company's practice is to credit depreciation expense each year for the amortization of the investment tax credit and thus reduce operating expenses, which benefits the ratepayers, we added the unamortized investment tax credit of $932,078 to the original cost and reproduction cost component of the rate base. (This figure is the difference between the $1,077,590 shown on Exhibit 40, page 229, column G, and the $145,512 credited through September 30, 1970, to depreciation expense shown on line 13 of the same page.)

"Finally, we reduce the Invested Capital component of the rate base by $3,128,000 to eliminate excessive merchandising investments. Ordinarily, the Commission has not required utilities to deduct merchandising from the invested capital component of a fair value rate base, but in this case we thought the amount of merchandising receivables (Exhibit 4) was excessive and that a large part of it should be disallowed.

"In summary, the fair value rate base of $91,984,000, as set out in the June 4 Order, was arrived at as follows:

| | (1) Original Cost less depreciation | (2) Reproduction Cost less depreciation | (3) Invested Capital | Fair Value Rate Base (⅓ Weighting of (1), (2) & (3)) |
|---|---|---|---|---|
| Exhibit 23, line 13 | $73,781,956 | $136,253,228 | | |
| Exhibit 23, line 17 | | | $76,393,076 | |
| Less Customer Advances (Exhibit 23, Line 15) | 318,634 | 318,634 | | |
| Plus Working Capital (Exhibit 23, line 14) | 5,349,000 | 5,349,000 | | |
| Less Commission Adjustment to Working Capital | 889,430 | 889,430 | | |
| Less Tax Reserve (Exhibit 23, line 16) | 6,918,000 | 6,918,000 | | |
| Plus Unamortized Tax Credit | 932,078 | 932,078 | | |
| Less Adjustment of Merchandising | | | 3,128,000 | |
| Less Adjustment to eliminate effect of January, 1971 Financing | | | 3,659,000 | |
| Adjusted | $71,936,970 | $134,408,742 | $69,606,076 | $91,984,000 |

"4. The rate base under Act 97 was arrived at as follows:

"We took the original cost depreciated and adjusted figure of $71,936,970 shown in the foregoing table, and adjusted this as follows:

"a. Applying Act 97, we included $8,610,000 for 'new investment to be added in the year immediately following the test period.' (Exhibit 43, total for column 1) The test year ended September 30, 1970.

"b. Next, we deducted highway reimbursements to be made in the year immediately following the test year of $200,000 (Tr. 1241).

"The net effect of these adjustments, which resulted in the finding in the June 4 Order of a rate base under Act 97 of $80,347,000 is summarized as follows:

| | Act 97 Rate Base |
|---|---|
| Original Cost Depreciated—Adjusted | $71,936,970 |
| Plus new investment to be added in the year immediately following test year | 8,610,000 |
| Less highway reimbursements | 200,000 |
| | $80,346,970 |

"5. The rate of return was arrived at as follows:

"a. The Company's actual cost of outstanding debt capital was 6.93% and the cost of preferred stock was 4.70%, neither of which figures was in dispute.

"b. Company witness Davis testified that in his opinion the return on equity capital should be 13.½% (Tr. 145), and Intervenor witness Suelflow testified that return on equity capital should be between 10.21% and 10.89% (Exhibit 61, page 13). It was the judgment of the Commission majority that the rate of return on equity should be between the rates testified to by these two witnesses, and the Commission majority concluded that a 12.09% rate of return on equity capital should be allowed.

"6. Taking into account the undisputed costs of debt and preferred stock noted above and our findings of 12.09% return on equity capital, we found a rate of return of 7.25% on a fair value rate base of $91,984,000 and an 8.3% rate of return on an Act 97 rate base of $80,347,000. The operating income produced in each case is approximately the same:

| Fair Value Rate Base | Act 97 Rate Base |
|---|---|
| $91,984,000 | $80,347,000 |
| x .0725 | x .083 |
| $ 6,668,840 | $ 6,668,801 |

"7. The actual operating revenues for the Company for the test year were $61,108,823 per books, producing operating income of $5,092,502 per books (Exhibit 7, page 1). However, it was necessary to adjust the revenues and income for: (1) unusually cold weather conditions existing during the test year; (2) annualizing certain operating revenues and expenses attributable to the Purchased Gas Adjustment Rider to take into account increases in costs of gas which had been in effect during only part of the test year; and (3) reflecting known changes which would affect operating expenses and revenues. Of those adjustments the only important one which was in dispute and which materially affected the end result was the weather adjustment. In making the year-end and weather adjustment, the Company followed the method specifically approved by the Commission in the Company's last rate case (Docket 14535, 1958; Re Alabama Gas Corp., 25 P.U.R.3d, 257, 272) and which method the Commission majority felt was still the appropriate method. Accordingly the Commission majority accepted the year-end and weather adjustment of $1,879,853 (Exhibit 24, line 1, column 4) made by the Company. The result of making these adjustments was to increase operating revenues by $3,550,000 (Exhibit 7, line 1, column 2). Adjustments to operating expenses were $3,943,258 (Exhibit 7, second column, next to last line), yielding a net downward adjustment in operating income of $393,258 for the test year. Thus the adjusted operating revenues for the test year were $64,658,823 and the operating income found was $4,699,244 (Exhibit 7, column 3, first and last lines).

"The June 4 Order required the Company, in effect to impute revenues attributable to the 6,000 to 6,500 new residential customers which would be added during the year following the test year. Assuming an average of 3,000 new customers throughout the year, the income (after taxes) produced by the new residential customers would be approximately $124,000 (based on the method used in the calculations in Exhibit 46).

"As shown above in Paragraph 6, the Commission majority found that operating income based upon a fair return on rate base should be $6,668,800, which was $1,969,556 more than the $4,699,244 adjusted operating income found for the test year (Exhibit 7). The increase in operating income requested by the Company (Exhibit 7) was $2,600,750. The amount al-

lowed by the Commission was $631,194 less, as shown below:

| | |
|---|---|
| Increase requested by Company | $2,600,750 |
| Increase allowed by Commission majority | 1,969,556 |
| Reduction | $ 631,194 |

"The reduction of $631,194 in operating income shown above, when added to the $124,000 of additional operating income from new customers to be added, produces a total reduction in operating income of $755,194. The reduction in *operating revenues* corresponding to a $755,194 reduction in *operating income* is (applying a tax factor of 0.50615) $1,492,000.

"In summary, the Commission majority reduced the requested rate increase as follows:

| | |
|---|---|
| Requested increase in operating revenues (Exhibit 28, line 10, Column 4) | $5,312,000 |
| Reduction in operating revenues required by June 4 Order | 1,492,000 |
| Increase in Operating Revenue granted by Commission majority | $3,820,000" |

HEFLIN, Chief Justice (concurring in the result):

The legislature of Alabama has restricted the review by courts of the action of the Public Service Commission in rate-fixing cases. The legislature has proclaimed that the rate-fixing order of the Public Service Commission must be taken as prima facie just and reasonable; and where the reasonableness or validity thereof is an issue, the burden is upon any party attacking such rates or orders to show that the same are invalid or unfair and unreasonable. Title 48, Section 71, Code of Alabama 1940 (Recompiled 1958). A long line of

decisions has interpreted this legislative mandate to mean that the Commission's order must be affirmed if there is any substantial evidence to support it. Hiller Truck Lines, Inc. v. Alabama Public Service Commission, 292 Ala. 161, 290 So.2d 649 (1974); Floyd & Beasley Transfer Co., Inc. v. Alabama Public Service Commission, 276 Ala. 130, 159 So.2d 833 (1964); Alabama Public Service Commission v. Nunis, 252 Ala. 30, 39 So.2d 409 (1949); Alabama Public Service Commission v. Crow, 247 Ala. 120, 22 So.2d 721 (1945); North Alabama Motor Express, Inc. v. Rookis, 244 Ala. 137, 12 So.2d 183 (1943).

In Alabama Public Service Commission v. Crow, 247 Ala. 120, 22 So.2d 721 (1945), the precedent was established that courts must guard against a substitution of their own judgment for the judgment of the Commission.

It is further clear that an appeal from a circuit court review of a Public Service Commission order reaches this court without any presumption favoring the correctness of the circuit court decision, and the Commission's order is reviewed in this court as though the appeal had been directly and primarily to this court. Alabama Public Service Commission v. Nunis, supra; Osborne Truck Lines, Inc. v. Alabama Public Service Commission, 284 Ala. 166, 168, 223 So.2d 284, 286 (1969); State v. Southern Bell Tel. & Tel. Co., 274 Ala. 288, 295, 148 So.2d 229, 235 (1962); Alabama Public Service Commission v. Southern Ry. Co., 269 Ala. 63, 66, 111 So.2d 214, 215 (1959).

The only reason expressed by the lower court for reversing the majority order of the Public Service Commission was that it was not supported by substantial evidence in the certified record. The certified record reveals that the company spent considerable time endeavoring to support its position with testimony. In all candor, I can not say that there was no substantial

evidence in the certified record to support the order of the Public Service Commission.

In regard to the fraud and misconduct issues, it seems to be abundantly clear that the intervenors do not contend that any fraud was involved. In fact, there was no allegation in the appeal to the lower court that there was any fraud or misconduct involved. While the trial court allowed the intervenors to present evidence on these issues, the trial court did not find any fraud or misconduct. If the trial court had based its judgment on fraud or misconduct it would have been inescapable that it would have had to remand the cause for a new hearing before the Public Service Commission, which it did not do.

I concur in the result of the opinion of this court since I can not say that there was no substantial evidence before the Public Service Commission to support its order.

JONES, Justice (concurring in the result).

I concur in the result reached by the majority opinion. I am constrained to comment on two aspects of the opinion: (1) the scope of review issue and (2) the findings of fact issue.

The scope of review propositions set forth in the opinion are entirely correct in the context of the instant appeal; but I would emphasize that this appeal does not involve the constitutional issue of confiscation. The rule governing the scope of review where constitutional issues of due process are properly raised and presented to the Court is set forth in Alabama Public Service Commission v. Southern Bell Telephone & Telegraph Co., 253 Ala. 1, 42 So. 2d 655 (1949).

I agree that in a case such as this in which there are no constitutional issues raised, but merely a factual determination, the Court's inquiry goes no further than to ascertain whether the Commission's order is reasonable and supported by substantial evidence in the certified record.

I do not reach the issue of the legal duty, if any, on the Commission to make findings of fact since I do not agree that there were no findings of fact by the Commission. Excerpts from the memorandum prepared from the certified record under the Circuit Court's direction and attached as the Appendix to the majority opinion, explaining how the Commission arrived at the rate base, the rate of return, and a detailed finding of the increase granted by the Commission could hardly be interpreted as anything other than findings of fact. I feel that the action of the Trial Court in directing the Commission to file with the Court such a memorandum was entirely proper, and I would shudder to imagine that the Commission in any such case would issue its opinion and order in the absence of detailed findings of fact upon which its opinion and order is based.

In concluding that this memorandum (Appendix) constitutes findings of fact by the Commission, I am aware that only one member of the original two-member majority of the Commission physically filed the memorandum. But two members, comprising a majority of the Commission, had executed the order appealed from, and the filing of the memorandum pursuant to the Circuit Court's direction nonetheless constituted the findings of fact on which the Commission's order was based. The Circuit Court treated the memorandum as findings of fact, and I think properly so.