[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 432 
This is an appeal by Alabama Gas Corporation ("Alabama Gas" or the "Company") from an order of the Alabama Public Service Commission ("Commission") granting in part and denying in part Alabama Gas's application for rate increase. This appeal is taken pursuant to the provisions of Code 1975, § 37-1-140, which provides for direct appeals to the Supreme Court of Alabama.
Alabama Gas initiated this proceeding on December 3, 1980, by filing a petition with the Commission requesting new schedules of rates for natural gas service to become effective January 3, 1981. The proposed rate schedules were designed to provide additional annual operating revenues of approximately $12,250,000, an increase of 4.4%.
Petitions for intervention were received from the Attorney General of the State of Alabama, Legal Services Corporation of Alabama, Alabama Consumers Alliance, John Paul Ripp and Robert Earl Duke. The above were determined to be affected by these proceedings within the provisions of § 37-1-87, Code 1975, and were permitted to intervene.
Direct testimony was prefiled by Alabama Gas and, beginning on April 7, 1981, Company witnesses were cross-examined at length. Subsequently, the Attorney General prefiled testimony and on May 13 and 14, 1981, presented his witnesses for cross-examination. The hearings were concluded on May 21, 1981, and briefs were submitted by the Company and the Attorney General on May 29, 1981.
On July 2, 1981, the Commission issued its order granting a $4.3 million increase. The Commission's order was based on a "test-year" which ended on September 30, 1980, with a six-month limitation on post-"test year" adjustments.
Alabama Gas filed its Notice of Appeal, together with a bond for security of costs on July 7, 1981. Application for supersedeas pursuant to § 37-1-141, Code 1975, was also filed with this Court. An appellate *Page 433 
expert was appointed to aid and assist the Court in this case. See Code 1975, § 37-1-143; Rule 33 (a), Rules of Appellate Procedure.
On July 30, 1981, this Court issued a partial supersedeas bond allowing the Company to collect an additional $2 million rate increase (a total of $6.3 million, having been determined by adding $2 million to the increase of $4.3 million granted by the Commission).[1]
On May 18, 1982, the Company renewed its application to supersede the order of the Commission. This Court held:
 (1) That the application for renewed supersedeas be denied;
 (2) That the additional increase in rates of $2,000,000 granted by the order of this Court dated July 30, 1981, should be subsumed by this order and that Alabama Gas was entitled to have the order of the Commission of July 2, 1981 (APSC Docket No. 18328), superseded to the extent that Alabama Gas could charge and collect, pending appeal, revenues that would produce an annual increase of fourteen million dollars ($14,000,000) over the annual rate of revenue in effect immediately prior to the filing of the proposed rates of Alabama Gas on December 3, 1981. The annual increase of $14,000,000 includes the additional $2,000,000 granted by the order of Court dated July 30, 1981.
Alabama Gas raised the following issues on appeal:
 I
Whether on appeal from a Public Service Commission order in which a utility alleges confiscation, this Court's standard of review of exercising its independent judgment eliminates the presumption of correctness given agency orders.
 II
Whether the Commission's order reflects reasonable rate-making policy in allowing only those known and measurable pro-forma adjustments to revenues and expenses which occurred within six months of the end of the test year.
 III
Whether the rate of return found by the Commission is confiscatory.
 IV
Whether the Commission's order with respect to depreciation, year end customer adjustment and regulatory commission expenses is based upon legal evidence of substantial weight and probative force.
 V
Whether the Commission's adjustment for rate base and operating income is proper.
 VI
Whether the Commission's order utilizes reasonable rate-making procedures regarding amortization of deferred federal income taxes.
 I
WHETHER ON APPEAL FROM A PUBLIC SERVICE COMMISSION ORDER IN WHICH A UTILITY ALLEGES CONFISCATION, THIS COURT'S STANDARD OF REVIEW OF EXERCISING ITS INDEPENDENT JUDGMENT ELIMINATES THE PRESUMPTION OF CORRECTNESS GIVEN AGENCY ORDERS.
Alabama Gas alleges that the Commission's order confiscates its property in violation of the 5th and 14th Amendments of the United States Constitution, as well as §§ 6 and 13 of Article 1 of the Alabama Constitution. From this, Alabama Gas states that the Court must "exercise its own *Page 434 
independent judgment in evaluating both the law and the facts presented in this appeal and not presume the Commission's order is valid or reasonable." The Attorney General agrees, citingAlabama Power Co. v. Alabama Public Service Comm'n,390 So.2d 1017 (Ala. 1980), that where confiscation is alleged the Court should exercise its own independent judgment in a broad scope evaluation of all the law and facts relevant to the case, not merely those raised on appeal. The Attorney General states, however, that there is no authority for Alabama Gas's view that by alleging confiscation it establishes a presumption of invalidity or unreasonableness of the Commission's order.
The Commission submits that even under the broader standard of review, mere allegations of confiscation will not suffice. The Commission states "The Company must show that the conclusions are arbitrary and unsupported by the evidence in order for this Court to disturb the order of the Commission." We agree with the Commission.
In Alabama Power Company v. APSC, 390 So.2d 1017 (Ala. 1980), this Court recognized a dual standard of review of rate cases:
 "A limited scope of review exists when the action is within the Commission's scope of authority, and this court's inquiry ordinarily goes no further than to ascertain whether there is evidence to support the Commission's findings. Id. Indeed, presumptions are generally indulged in favor of the orders of the Commission, the major presumption being that the Commission's order is prima facie just and reasonable. See State v. Alabama Public Service Comm'n, 293 Ala. 553, 307 So.2d 521 (1975); Alabama Gas Corporation v. Wallace, 293 Ala. 594, 308 So.2d 674 (1975). In contrast, a much broader scope of review of the Commission's orders is required when confiscation is alleged; in that event, this Court must exercise its own independent judgment on the facts and the law. General Telephone Company of the Southeast v. Alabama Public Service Commission, supra." Id. at 1025.
Decisions in the past have been silent on the proof necessary by the utility to allow the Court to broaden its review to judge the constitutional issue. As a result thereof, this Court has judged utility rate cases where confiscation is alleged under the broad scope of review.
The issue now is whether the broader scope of review (the independent judgment test), is to continue to be the proper method of judicial review when confiscation is merely alleged by a utility company. In Public Service Comm'n v. GeneralTelephone Co., 555 S.W.2d 395 (Tenn. 1977), the Tennessee Supreme Court stated that the substantial evidence standard is the proper method for judicial determination of the issue of confiscation in rate cases. The Court continued:
 "We . . . hold that the scope of review articulated in T.C.A. § 4-523 (h) provides adequate standards within constitutional limits for judicial determination of the issue of confiscation in rate cases.
 "Tennessee Code Annotated § 4-523 (h) provides that a court may reverse or modify the PSC if the rights of the petitioner have been prejudiced because the decision is:
 "(1) in violation of constitutional or statutory provisions;
 "(2) in excess of the statutory authority of the agency;
"(3) made upon unlawful procedure;
 "(4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
Similarly, § 37-1-124, Code 1975, prescribes that the Commission's order shall be taken as prima facie just and reasonable and that this court shall set aside the order only if it finds that:
 (1) The Commission erred to the prejudice of appellant's substantial rights in its application of the law; or
 (2) The order, decision or award was procured by fraud or was based upon a finding of facts contrary to the substantial weight of the evidence. *Page 435 
Using the broad scope of review when confiscation is merely alleged has rendered this code section almost meaningless.
We hold that the Company has the burden of clearly establishing from the record that the Commission's order is confiscatory in order to invoke this Court's independent review.
In St. Joseph Stock Yards Company v. United States,298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033 (1936), Chief Justice Hughes, writing for the Court, stated:
 "The established principle which guides the court in the exercise of its judgment on the entire case is that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established." (Citations omitted.) (At 53.)
We agree with Chief Justice Hughes that confiscation must be clearly established by the complaining party in order to invoke a broader scope of review in utility rate cases. With this case we prospectively adopt the stricter standard, i.e. that confiscation must be clearly established by the utility in order to invoke the broader scope of review.
 II
WHETHER THE COMMISSION'S ORDER REFLECTS REASONABLE RATE-MAKING POLICY IN ALLOWING ONLY THOSE KNOWN AND MEASURABLE PRO-FORMA ADJUSTMENTS TO REVENUES AND EXPENSES WHICH OCCURRED WITHIN SIX MONTHS OF THE END OF THE TEST YEAR.
The Company filed its testimony and exhibits with the Commission based on a twelve-month operating period ending September 30, 1980. The Company adjusted operating income for the test period via numerous "pro-forma" adjustments, purporting to reflect "known and measurable" changes which occurred or would occur after September 30, 1980. The Company contends that changes that do occur and can be reasonably estimated within one year after the end of the test period should constitute "known and measurable" changes. The Commission, however, made no adjustments to test year expenses for changes occurring more than six months after the end of the test year.
While the circumstances of each case may vary, so as to require a flexible rule, under the facts of this case, the six-month post-test year period is arbitrary and capricious. We therefore hold that the Commission's order setting a six-month post-test year period is unreasonable under the facts of this case.
 III
WHETHER THE RATE OF RETURN FOUND BY THE COMMISSION IS UNJUST AND UNREASONABLY LOW, RESULTING IN CONFISCATION OF THE COMPANY'S PROPERTY.
In the present case, the Commission made findings as to the Company's cost of capital, the three major components of which are long-term debt, preferred stock and common stock equity. Mr. Jackson, an expert for the Company, calculated that the cost rates associated with long-term debt, preferred stock, and common equity are 7.91%, 4.70%, and 15.25% respectively. While agreeing with the Company's finding on cost of preferred stock, the Commission found that the Company's cost of long-term debt is 7.07% and common equity is 14%.
The Company argues that since no other witness testified as to these components, there is no evidence upon which the Commission could base a lower rate of return on long-term debt or common equity. We find no authority for the proposition that the Commission is rigidly bound to the recommendation of any particular witness. The Commission's function is to sit as an expert administrative body analyzing the evidence and exercising its own expert judgment thereon. Alabama Gas Corp.v. Wallace, 293 Ala. 594, 308 So.2d 674 (1975). The Commission's duty is to fix rates in a fair and reasonable manner. See, e.g., § 37-1-80, Code 1975; Illinois Cent. R.R. v.Thomas Alabama Kaolin Co., 275 Ala. 236, *Page 436 153 So.2d 794 (1963). The question of what constitutes just and reasonable rates must be determined in the light of all the relevant facts. Birmingham Elec. Co. v. Alabama Public ServiceComm'n, 254 Ala. 140, 47 So.2d 455 (1949).
This court on numerous occasions has listed several legal principles which control the determination of a fair rate of return in order to avoid confiscation:
 "I. The reasonable rate of return depends upon many circumstances. It cannot be developed by a rule of thumb calculation. It must be determined in the exercise of a fair, enlightened and independent judgment of all relevant facts.
. . . . .
 "II. The rate of return must be equal to that generally being earned by others in the same general locality in business undertakings attended by corresponding risks and uncertainties. . . .
 "III. The return must be sufficient to assure the investor's confidence in the financial soundness of the utility enterprise and enough to maintain and support its credit so that it will be able to raise the money necessary to improve and expand its service to the discharge of its public duties. . . .
 "IV. In determining the reasonableness of rates, it is necessary to consider the effect of the rates imposed in the light of the utility's present situation and in light of its requirements and opportunities. . . ."
Alabama Power Company v. Alabama Public Service Comm'n,390 So.2d 1017, 1024 (Ala. 1980); Alabama Public Service Comm'n v.South Central Bell, 348 So.2d 443, 446 (Ala. 1977). See,Alabama Public Service Comm'n v. Southern Bell T. T. Co.,253 Ala. 1, 42 So.2d 655 (1949). Continental Telephone Company ofthe South v. Alabama Public Service Comm'n, 376 So.2d 1358,1361 (Ala. 1979).
Mr. Jackson, the Company expert, used three techniques in developing his estimate in regard to a fair rate of return: discounted cash flow, and bond yield plus risk premium and comparable earnings methods.
Using the discounted cash flow (DCF) method, Mr. Jackson developed his DCF cost of equity estimate of 14.78% to 15.33% by applying a 20% adjustment to the standard DCF method. The Commission accepted the DCF theory but disagreed with the 20% adjustment in that it departed from commonly accepted financial theory. We agree with the Commission that the adjustment is inconsistent with the DCF theory.
Another method employed by Mr. Jackson was bond yield plus risk premium. Using an average bond yield on A-rated utility bonds since October, 1979, and a risk premium developed from his own study, Mr. Jackson developed a cost of equity estimate of 16.33%. The Commission argues, and we agree, that little weight should be given this approach. The Commission's order stated:
 "[W]e have some concern with his method of developing his risk premium value. He began by computing a dividend yield and growth rate for Moody's Natural Gas Distribution Common Stock Index for each year 1960-1979. From this sum he subtracted the average annual Moody's A-rated utility bond yield for each year to develop a risk premium. He then went through several averaging processes to develop his risk premium of 3.25%.
 "A most obvious question in Mr. Jackson's methodology is his use of two different groups to measure the risk differential. The risk premium should be a measure of the risk differential between a company's or a group of companies' required rate of return on equity and that company's or group of companies' bond yield. Mr. Jackson did not use the same groups to develop required rates of return and bond yields; thus, it is difficult for the Commission to recommend this approach."
Mr. Jackson testified that he did not place primary reliance on any one particular method but he did agree that the best measure of the cost of common equity capital *Page 437 
was the relation of earnings to book value for representative companies over a period of time. That relation was the basis of Mr. Jackson's comparable earnings analysis.
The order of the Commission concerning the comparable earnings study stated:
"The comparable earnings study consisted of a review of several financial indicators for a group of comparison companies from 1975 through 1979. . . . Mr. Jackson did not develop a specific cost of equity estimate in his comparable earnings study; he did, however, conclude that since the average current return of 14.2% in 1979 for his group of comparison companies resulted in a market-to-book ratio on average of .90, the companies were not earning their cost of equity. From this he further concluded that Alabama Gas Corporation's cost of equity was something greater than 14.2%.
"Aside from the question of the risk comparability of the comparison companies, there were other questions raised in Mr. Jackson's comparable earnings testimony. There were no results beyond 1979 considered in regard to the comparison companies. Alabama Gas Corporation's financial position improved appreciably in 1980 relative to 1979. Also, Mr. Jackson, at least prior to cross-examination, seemed to assume that a firm's market-to-book ratio was solely a function of its earned rate of return on book equity. Mr. Jackson agreed during cross-examination that other factors besides rates of return on equity affected a firm's market-to-book ratio and he also had considered these other factors in reaching his conclusion that a 14.2% rate of return resulted in a market-to-book ratio of .9. Unfortunately, that review was not provided in his testimony. Finally, in reaching his conclusion that a 14.2% rate of return on equity was less than the cost of equity for Alabama Gas Corporation because that rate of return had resulted in comparable firms having an average market-to-book of .9, Mr. Jackson failed to consider several indicators of risk that would suggest Alabama Gas Corporation had a lower required rate of return on equity.
"The record shows at least two factors that suggest Alabama Gas Corporation's risk and consequently its required rate of return are lower than that of the comparison companies. First, it was developed that several of the comparison companies were either holding companies with gas pipeline and exploration subsidiaries or gas distribution companies that engaged in pipeline and exploration activities. Second, Alabama Gas Corporation has a higher equity ratio than the average of the comparison companies, 51% in 1979, vs. 43.7% for the group. Mr. Jackson testified that common equity investors perceive their risk exposure as being directly proportional to the degree of leverage employed by the Company and given the lower leverage employed by Alabama Gas Corporation relative to the average of the comparison companies, one must conclude that the Company has less risk and a lower required rate of return in relation to these comparison companies.
". . . .
"The Commission agrees that the impact of the Company's higher equity ratio, all other things being equal, is a lower cost of equity, and having discounted Mr. Jackson's risk premium estimate and questioned his DCF analysis, we find the range of a fair rate of return on common equity to be lower than the 15% to 16.5% range. After considering all testimony, exhibits and evidence of record, the comparable earnings approach appears to have certain merit, even though all the companies were not exactly the same. It was noted that the equity ratio of the Company is relatively high causing the risk factor to decrease and certain items may not have been considered in determining the market price/book value relationship. The 14.2% calculated by Mr. Jackson seems to be consistent with the comparable sample of the industry. However, the lesser risk due to higher equity is also to be considered when using this method. A return on equity of 14% is, therefore, considered just and reasonable."
This Court finds that a rate of return of 14.2% is consistent with the evidence in the record. The Commission arbitrarily disregarded .2% in its order. *Page 438 
 IV
WHETHER THE COMMISSION'S ORDER WITH RESPECT TO DEPRECIATION, YEAR END CUSTOMER ADJUSTMENT AND REGULATORY COMMISSION EXPENSES IS BASED UPON LEGAL EVIDENCE OF SUBSTANTIAL WEIGHT AND PROBATIVE FORCE.
A. Depreciation
Alabama Gas Corporation claimed depreciation expense of $6,893,279 in its cost of service based on a remaining life depreciation study. The Commission rejected the utility's study, and accepted instead the $5,277,755 depreciation expense estimate of the Attorney General's witness, Mr. Weiss. The basic difference between the Company's and the Commission's figures on allowable depreciation is negative salvage value.
Negative salvage occurs when the cost of removing an asset from utility service exceeds the positive salvage value of the asset. The Commission did not dispute the fact that negative salvage is a proper element of utility cost; however, the Commission would not allow the Company to collect the cost of negative net salvage until it is incurred.
By requiring Alabama Gas to wait until an asset is actually retired to collect the expense, the cost of present use will be paid for by future customers, not the present customers who benefit from the assets. This is inconsistent with the policy of many public utilities commissions and courts throughout the nation.
The New York Public Service Commission in In re: ConsolidatedEdison Company of New York, 29 P.U.R. 4th 327 (N.Y.P.S.C. 1979), stated:
 "We conclude that we should allow some revenue to meet decommissioning expense because it is a legitimate cost of service which should be paid by those customers using the nuclear plant. Decommissioning is a necessary expense associated with an investment that no party contends is imprudent or unjustified. Under these circumstances, the most equitable choice is to allow the utility to recover the cost from customers. Moreover, the company should begin to provide for these costs now, collecting them from the customers deriving benefit from the plant rather than from those who are taking service at the time the plant is decommissioned."
See also, In re Connecticut Natural Gas Corp., 37 P.U.R. 4th 287 (Conn.P.U.C. 1980); Providence Gas Co. v. Burke,419 A.2d 263 (R.I. 1980); Connecticut Light Power v. Public UtilitiesControl, 176 Conn. 191, 405 A.2d 638 (1970); In re Iroquois GasCorp., 85 P.U.R. 3rd 356 (N.Y.P.S.C. 1970); Missouri PublicService Commission v. Rich-Hill-Hurne Gas Co., 72 P.U.R.3rd 245 (Mo. 1968).
A fundamental objective in utility ratemaking is that customers who benefit from a service should bear the costs of providing that service. To recognize net salvage (positive or negative) only when it is actually experienced instead of distributing the amounts over the service life of the related property violates this basic principle.
B. Year-end Customer Adjustment
Alabama Gas argues that the Commission's year-end customer adjustment increasing operating revenues $673,245 and cost of gas $410,142 is not supported by the record.
Initially, Alabama Gas Corporation's witness, Mr. Turner, proposed to increase test year revenues and cost of gas to reflect the number of residential and small commercial customers at September 30, 1980, as though they had been customers for the full year. This was accomplished by spreading the increase in number of customers between September 30, 1979, and September 30, 1980, evenly throughout the test year. The Attorney General's witness, Mr. Peterson, adopted the same methodology as Turner, except that he used the actual increase in customers each month instead of the average.
Alabama Gas Corporation then offered a second witness, Mr. Patzke, who corrected the Attorney General's figures to reflect *Page 439 
the acquisition of the Rainbow City gas system during 1979 and 1980. On rebuttal, Alabama Gas Corporation's witness, Mr. Turner, stated that no adjustment should be made when the number of customers is actually declining. Based on Turner's rebuttal testimony, the Company changed its position to argue that no adjustment should be made.
The Commission, however, correctly adopted an adjustment increasing test-year operating revenues and cost of gas to reflect the number of residential and small commercial customers at the end of the test-year as though they had been customers for the full year.
 V
WHETHER THE COMMISSION'S ADJUSTMENT FOR RATE BASE AND OPERATING INCOME IS PROPER.
The Company asserts that certain of the rate base and operating income adjustments made by the Commission in its order are erroneous and not supported by the evidence. We disagree.
A. Allowance for Funds Used During Construction (AFUDC).
At the end of the test-year, Alabama Gas had a total of $622,623 of construction work in progress (CWIP). The Commission multiplied this amount by the authorized rate of return (8.23%) to obtain a figure of $51,927 which was used to reduce revenue. Alabama Gas argues that this adjustment is unsupported by any evidence in the record and misstates operating income for purposes of setting rates.
This Court in Alabama Power Co. v. APSC, 359 So.2d 776 (Ala. 1978), said that it is appropriate to include CWIP in rate base, but that when CWIP is included, allowance for funds used during construction (AFUDC) should be credited to operating income to prevent a double return on the CWIP. The theory of AFUDC is that investors are entitled to compensation for funds used to construct new plants, prior to the time the plant is placed in service. A conflicting interest, however, is that customers should not be burdened with the carrying costs of such new plants.
The Commission's order includes CWIP in rate base and includes the funds by which CWIP was financed in the Company's capitalization, and then deducts AFUDC from the net operating income requirement. This Court finds that the Commission's treatment of AFUDC in this cause is consistent with past agency treatment of AFUDC and with Alabama Power Co. v. APSC, supra.
B. Book Value
The Company argues that the method used by the Commission in developing a revenue requirement for the Company is confiscatory. This Court finds that the Commission is under no constitutional requirement to use any particular method in establishing rates; but that the fair net return allowed must justly compensate the Company for the property it devoted to public service. See, e.g., Federal Power Commission v. NaturalGas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037
(1942); Federal Power Commission v. Hope Natural Gas Co.,320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1942). Under the provisions of § 37-1-80, Code of Alabama 1975, the reasonable value of a public utility's property, or "rate base," is "the original cost thereof, less the accrued depreciation, as of the most recent date available."
Company witness Richard J. Patzke developed the statutory rate base as follows:
 Utility Plant in Service $178,877,613 Accumulated Provision for Depreciation (67,832,396) ------------- Net Utility Plant in Service $111,045,217 ------------- Working Capital 8,195,903 Total Statutory Rate Base $119,241,120
The Attorney General's witness, Mr. Peterson, testified that the rate base should be $83,708,668 computed as follows:
 Plant in Service $178,877,613 Accumulated Provision for Depreciation (67,832,396) ------------- Net Plant in Service $111,045,217 *Page 440 
Working Capital: Materials Supplies 4,418,124 Prepayments 815,557 Cash Working Capital (3,896,041) Unamortized Regulatory Commission Expense 58,529 Customer Deposits (6,554,327) Customer Advances for Construction (2,420,184) Accumulated Deferred Federal Income Taxes (19,172,000) Accumulated Deferred Investment Tax Credit (586,207) ----------- Total Rate Base $83,708,668
The Commission rejected Peterson's finding and found the rate base to be $111,402,944, detailed as follows:
Plant in Service: $178,877,613
 Accumulated Provision for Depreciation $67,832,396 Less: Depreciation Adjustment (411,893) (67,420,503) -------------- Net Plant in Service $111,457,110
Working Capital:
 Materials and Supplies 4,418,124 Prepayments 815,557 Cash Working Capital (3,490,286) ----------- Total Working Capital 1,743,395 Construction Work-in-Progress 622,623 ------------ Rate Base $113,823,128 Less: Customer Advances for Construction 2,420,184 ------------ TOTAL STATUTORY RATE BASE $111,402,944
In determining a statutory rate base for Alabama Gas Corporation, there was no disagreement among the parties as to the depreciated book cost of plant in service. The Attorney General's witness wanted to deduct certain items of non-investor supplied capital from plant as shown in his computations above. The Commission chose instead to add some items to capital as shown in its schedule above.
This Court finds that the rate base for Alabama Gas was properly calculated. The primary purpose for computing a rate base is to make certain that the capital of a utility is actually invested in utility plant, and not in non-utility assets.
Section 37-1-80, Code 1975, states in pertinent part:
 "Every utility shall be entitled to such just and reasonable rates as will enable it at all times to fully perform its duties to the public and will, under honest, efficient, and economical management, earn a fair net return on the reasonable value of its property devoted to the public service."
We conclude that under the evidence and the rate base as determined by the Commission, Alabama Gas Corporation will have an opportunity to earn a fair net return on the reasonable value of its property devoted to the public service.
C. Interest Income
Alabama Gas claims that the Commission arbitrarily and erroneously reduced revenue requirements by crediting operating income with non-utility interest income of $157,802, net of income taxes. We agree with Alabama Gas that there is no evidence to support the Commission's treatment of interest income. The Commission gives no explanation as to why interest income was used to adjust net utility operating income; thus, the adjustment should be reversed, and operating income required from customers should be increased $157,802.
D. Profit on Preferred Stock Redemption and Debt Redemption
The Commission reduced required operating income by $16,000 representing "profit on preferred stock redemption" and by $126,768 representing "profit on debt redemption."
The Commission credited the gain on reacquisition of preferred stock and debt redemption to current income. The Commission's treatment of these items is consistent with other recent decisions of the Commission and is fair and reasonable.
 VI
WHETHER THE COMMISSION'S ORDER UTILIZES REASONABLE RATE-MAKING PROCEDURES REGARDING AMORTIZATION OF DEFERRED FEDERAL INCOME TAXES.
The Company asserts that compliance with the part of the Commission's order requiring the Company to amortize *Page 441 
the "excess" in the deferred tax reserve resulting from the federal income tax rate reduction from 48% to 46% over a five-year period "violates the applicable Internal Revenue Code provisions and regulations and may result in the loss of the right to take accelerated depreciation."
This Court finds that the Commission did not violate generally accepted accounting principles, or the provisions of the FERC Uniform System of Accounts. The accounting principles promulgated by the Accounting Principles Board refer to nonregulated industries, and specifically recognize that, in the case of a regulated company, different principles might apply. The FERC Uniform System of Accounts for Natural Gas Companies that was in effect during the test year did not specifically discuss changes in tax rates.
The Company also claims that a five-year amortization of the overaccrual might violate the tax normalization accounting requirements of the Internal Revenue Code. The Commission argues, however, that the order will have no effect on the Company's qualifying for the benefits of § 167 of the Internal Revenue Code.
IRC § 167 (l)(3)(G) provides that:
 "In order to use a normalization method of accounting with respect to any public utility property — (i) the taxpayer must use the same method of depreciation to compute both its tax expense and its depreciation expense for purposes of establishing its cost of service for ratemaking purposes and for reflecting operating results in its regulated books of account, and (ii) if, to compute its allowance for depreciation under this section, it uses a method of depreciation other than the method it used for the purposes described in clause (i) [straight-line], the taxpayer must make adjustments to a reserve to reflect the deferral of taxes resulting from the use of such different methods of depreciation."
Furthermore, with respect to adjustments to the reserve for deferred income taxes, IRS Regulation 1.167 (l)-1(h)(2) provides, in part:
 "The taxpayer must credit the amount of deferred Federal income tax . . . for any taxable year to a reserve for deferred taxes, a depreciation reserve, or other reserve account. . . . With respect to any account, the aggregate amount allocable to deferred tax under Section 167 (l) shall not be reduced except to reflect the amount for any taxable year by which Federal income taxes are greater by reason of the prior use of different methods of depreciation. . . . An additional exception is that the aggregate amount allocable to deferred tax under Section 167 (l) may be properly adjusted to reflect asset retirements or the expiration of the period for depreciation used in determining the allowance for depreciation under Section 167 (a)."
Accordingly, this Court finds that the Commission's order did not violate generally accepted accounting principles, or the provisions of the FERC Uniform System of Accounts.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
TORBERT, C.J., and JONES, ALMON, SHORES, EMBRY, BEATTY and ADAMS, JJ., concur.
MADDOX, J., not sitting.
[1] In a subsequent appeal (Case No. 81-804), this Court granted supersedeas in the amount of $14,000,000.00 — the $2,000,000.00 supersedeas involved in this case being subsumed in the subsequent appeal.