Alabama Power Company (the company) appeals from an October 16, 1981, order of the Alabama Public Service Commission (the commission) denying the company's petition for a rate increase. Code 1975 (1982 Supplement), § 37-1-140, grants the right to appeal directly to this Court from orders of the commission in rate cases such as this case.
 CASE HISTORY
The company filed a new rate schedule with the commission on March 19, 1981, to become effective on April 18, 1981. See Code 1975, § 37-1-81 (a). The commission ordered the schedule suspended through October 18, 1981 — the maximum suspension allowed, § 37-1-81 (b). Numerous parties intervened, including the Attorney General as consumer advocate. See Code 1975 (1982 Supplement), § 37-1-16. The commission held hearings on the matter from June 29 through September 25, 1981, producing 7,971 pages of transcript and 126 exhibits. On October 13, 1981, the commission voted to deny any rate increase and issued a final order to that effect on October 16. The company filed notice of appeal on the same day.
The company's proposed rate schedule sought to produce additional annual revenues of $324.9 million, approximately an 18% net increase in rates to customers. Upon filing this appeal, the company also applied for supersedeas in the full amount of its request as provided in Code 1975 (1982 Supplement), § 37-1-141. The company filed a brief in support of its application for supersedeas; the commission, the Attorney General, and the Alabama League of Aging Citizens, Inc., an intervenor in the commission hearings, filed briefs in opposition to the application.
On November 5, 1981, R.S. Crowder, intervenor below, filed a separate appeal from the commission's order. This appeal was consolidated with the company's appeal.
On November 20 this Court ordered the commission to respond to allegations of confiscation made by the company in its application for supersedeas, and to answer specific questions set out in the order. The commission filed its response and answers on December 11; on December 16, the company filed its own responses to both the questions and the commission's answers.
On February 12, 1982, this Court issued an order superseding the commission's order of October 16 to allow the company to collect, under supersedeas bond, an amount which would increase the company's revenues in the ensuing six months by $75 million. The order also required the company to file a report with this Court reflecting the company's experience under the commission's zero order and additional reports monthly during the pendency of the appeal. The reports were to include computations of the annualized rate of return to equity that the company earned or would have earned under supersedeas as granted, under the zero order without any supersedeas, and under full supersedeas as requested by the company.
The company filed its supersedeas bond in the required amount of $150 million on February 12, 1982. On February 16 it filed a new schedule of rates to collect the amount allowed under supersedeas. On February 19 the company filed the first report required by the supersedeas order, and has continued to file its reports every month.
The parties presented oral argument before this Court and the case was submitted on the merits.
 PRINCIPLES OF REVIEW
This case has presented particular difficulty for our review because the commission's order is almost void of references to the record. See Appendix A.[1] Instead, the *Page 769 
commissioners relied on their "common sense" knowledge of the difficult economic times, the fact that they had already given the company rate relief in recent years, and their refusal to consider the effects of the second unit of the Farley nuclear plant (Farley II). Finding that the company was earning 12.43% on equity at the end of the test period and that the returns for the following four months (i.e., until Farley II went on line) had increased slightly, the commission concluded that the company's earnings were "adequate for the present" and denied any increase in rates.
Appellate review of commission rate orders is predicated on Code 1975 (1982 Supplement), § 37-1-140, et seq. The 1978 statute now codified in these sections supersedes the older code sections, Code 1975, § 37-1-120, et seq., which provided the Circuit Court of Montgomery County as an intermediate court of appeals. Nevertheless, the principles governing review remain largely the same.
We begin with the statutory guidelines for utility rates:
 "§ 37-1-80. Rates to be just and reasonable; right of utility to earn fair net return.
 "The rates and charges for the services rendered and required shall be reasonable and just to both the utility and the public. Every utility shall be entitled to such just and reasonable rates as will enable it at all times to fully perform its duties to the public and will, under honest, efficient and economical management, earn a fair net return on the reasonable value of its property devoted to the public service. For the purpose of fixing rates, such reasonable value of a public utility's property shall be deemed to be the original cost thereof, less the accrued depreciation, as of the most recent date available. In any determination of the commission as to what constitutes such a fair return, the commission shall give due consideration among other things to the requirements of the business with respect to the utility under consideration, and the necessity, under honest, efficient and economical management of such utility, of enlarging plants, facilities and equipment of the utility under consideration, in order to provide that portion of the public served thereby with adequate service."
Code 1975 (1982 Supplement).[2]
The determination of rates and of what constitutes a fair return on the utility's property is a legislative question which the legislature has delegated to the commission. "This Court's inquiry ordinarily goes no further than to ascertain whether there is evidence to support the findings of the Commission." Alabama Gas Corp. v. Wallace, 293 Ala. 594, 602,308 So.2d 674 (1975). See, also General Telephone Co. of theSoutheast v. Alabama Public Service Commission, 335 So.2d 151
(Ala. 1976); Birmingham Electric Co. v. Alabama Public ServiceCommission, 254 Ala. 140, 47 So.2d 455 (1949); St. JosephStockyards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720,80 L.Ed. 1033 (1936).
A consideration which overrides these issues of legislative function, delegation, and limited judicial review, however, is the constitutional question of whether the commission's order operates to deprive the company of its property without just compensation or due process of law. The company raises this question by properly alleging confiscation of its property.
 ". . . In this consideration we should remember the principle that the property of a public utility, although devoted to the public service and impressed with a public interest, is still private property. Neither the property nor its use can be taken for a compulsory price which falls below the measure of fair and just compensation. In the case of Board of Public Utility Commissioners v. New York Telephone *Page 770 Company, 271 U.S. 23, 32, 46 S.Ct. 363, 366, 70 L.Ed. 808, 812, the Supreme Court of the United States said:
 `The just compensation safeguarded to the utility by the Fourteenth Amendment is a reasonable return on the value of the property used at the time that it is being used for the public service, and rates not sufficient to yield that return are confiscatory. * * *.'"
Alabama Public Service Commission v. Southern Bell Telephone Telegraph Co., 253 Ala. 1, 12, 42 So.2d 655 (1949) (hereinafterAPSC v. Southern Bell).
The commission asserts that the utility must prove confiscation, not merely allege it, before review of a rate order takes on constitutional dimensions; otherwise, a utility could always bypass the normal limited review of commission orders. The commission is correct to the extent that, once a utility has raised the issue of confiscation on appeal, the record must show by substantial evidence that confiscation has taken place. If it fails to do so, the court will not only decline to broadly review a technical, voluminous record; it may very well affirm the commission's order. See, Alabama GasCorp. v. Alabama Public Service Commission, 425 So.2d 430 (Ala. 1982).
Not only has the company in this case properly alleged and argued confiscation, but also the record clearly shows that the order is confiscatory. The commission determined 12.43% return on equity to be "adequate for the present," when the lowest figure supported by the record is 15%. Even granting some judgment by the commission to allow a return below that testified to by experts, we find the 12.43% figure confiscatory, if only because it does not reflect the actual returns the company would earn during the period the rates were to be in effect. Beyond the narrow question of return on equity, we find that on the whole, the zero order does not allow the company a fair return on the reasonable value of its property devoted to public service.
 THE MERITS OF THE CASE
The statutorily and constitutionally mandated fair rate of return applies to the company's property devoted to the public, the value of which is the company's "rate base." This return involves cost of debt capital, cost of preferred stock, and cost of equity capital (i.e., common stock). Alabama GasCorporation v. Wallace, 293 Ala. 594, 308 So.2d 674 (1975). As the first two are relatively fixed, rate cases often focus on the third under the rubric "return on equity." Broadly speaking, this is the amount needed to pay dividends which would make the company's stock attractive to investors.
The company contends, on the basis of testimony by expert witnesses during the hearings before the commission, that because the interest rate on bonds sold by the company during 1981 was 17 3/8 to 18 1/4%, their less-secure common stock must have at least an 18% return.[3] It asserts that the commission's order is therefore obviously confiscatory when it states that the 12.43% return earned for the 12 months ending March 31, 1981, is adequate.
As noted above, the commission's order makes no findings as to rate base or fair return on rate base. Its finding that 12.43% is a fair return on equity makes no reference to the record or figures concerning the company's operations.
We note that the Attorney General's proposal, later withdrawn, suggested a 16% *Page 771 
return. Dr. Legler, a witness sponsored by the Attorney General, concluded that a return in the range of 15-16% would be fair. He gave a figure of 14.5% from one calculation (a risk premium analysis), but he admitted that he would not rely on this method alone. His discounted cash flow and comparative study analyses gave higher figures.
The commission argues that if the statutory mandate that rates are to be fair to both the utility and the public is to have any meaning, it should be able to consider factors such as the ability of people to pay the company's rates. It also points out that this Court has included other businesses of like risk in consideration of a fair rate of return (see, APSCv. Southern Bell, supra). The order sets out that competitive businesses in the state are earning poor returns at present, and cites evidence of record that the textile industry is earning a 2.54% return.
On the other hand, the commission has admitted in its response to questions from this Court that under its zero order the company's return on equity would fall below 4% by October 1982. This results largely from the refusal by the commission to consider the effects of Farley II, which came on line in July 1981 and caused the company's rate of return to begin falling steadily.
The reports filed pursuant to the supersedeas order show the following returns on average equity:
 For the 12 months Under Supersedeas Under the Under
 Ended as Granted Commission's Order Supersedeas
 as Requested
 ---------------- ----------------- ----------------- ------------
 October 1981 10.58% 10.52% 10.62%
 November 1981 9.79 9.27 10.17
 December 1981 9.29 8.17 10.10
 January 1982 9.06 7.25 10.35
 February 1982 8.77 6.32 10.47
 March 1982 8.63 5.66 10.69
 April 1982 8.87 5.32 11.14
 May 1982 9.35 5.15 12.01
 June 1982 9.57 4.79 12.62
 July 1982 9.33 3.85 12.84
 August 1982 9.70 3.56 13.66
 September 1982 10.51 3.67 14.98

The company filed projections with the commission of its rate of return both with no rate increase and with the full requested increase. These figures have been accurate to within about half a percentage point until the July, August, and September figures for the full increase. The projected figures were 13.89, 14.66, and 15.59 respectively, and the figures based on actual results were 12.84, 13.66, and 14.98 as shown above. The projected return for the year ended October 1982 was 16.72%; these most recent figures suggest the company would not have received this return with the full requested increase. The projected October 1982 annualized return with no increase was 3.19%.
This highlights the fact that the commission ignores the requirement that the rates it sets must be prospective.McCardle v. Indianapolis Water Co., 272 U.S. 400, 47 S.Ct. 144,71 L.Ed. 316 (1926). The order glibly supports its "finding" that a 12.43% return on equity from the end of the March 1981 test year is "adequate for the present" by citing these figures:
 April 1981 12.61% May 12.72 June 12.61 July 13.07
This conveniently ignores the following figures available to the commission when it made its order: *Page 772 
 August 1981 12.36% September 11.34
Even disregarding the company's projections, the commission knew the company's rate of return was declining when it issued its order.
Farley II was the primary cause of this decline, and the commission refused to consider the effects of Farley II because it came on line four months after the end of the test year and its effects would not be known and measurable. The company offered an updated test year ending July 31, 1981, but the commission declined to consider these data on the basis that there was no time to cross-examine the company's witnesses who submitted their written testimony or otherwise to verify the company's figures. The commission's response to the company's attempt to include Farley II was a suggestion that the company file another new rate schedule.[4]
The company countered the charge that Farley II's effects were not known and measurable with the uncontroverted evidence that required accounting procedures relating to the nuclear plant would result in a $4 million dollar per month loss. During construction of a new plant, a utility credits its income, according to the investment in construction work in progress (CWIP), under an account called "allowance for funds used during construction" (AFUDC). This treatment gives the company an on-paper return on the CWIP portion of the rate base without requiring present customers to pay for future generating facilities. See, e.g., Ex Parte Gulf StatesUtilities Co., 40 P.U.R. 4th 593 (La.P.S.C. 1980). The commission admitted in its answers to specific questions propounded by this Court that the $4 million a month AFUDC income the company showed prior to Farley II going on line was part of the income resulting in the test-year-end 12.43% return on equity.
The cost of Farley II does not stop at $4 million a month, i.e., $48 million per year, however. Because utilities are entitled to a fair net return (§ 37-1-80), this return must be after taxes. Formulas exist for converting income (i.e., after tax income) deficiencies to revenue deficiencies. In this case the parties agree that a tax multiplier of 1.9874 . . . would convert this $48 million income deficiency to a $96 million revenue deficiency. Add to this amount new expenses shown by the company relating to depreciation of the nuclear plant, maintenance, completion costs, and ad valorem taxes, and it becomes clear that the largest portion of the company's rate increase request pertains to Farley II.
The commission seeks to disallow these expenses as a factor in the company's current rates on the grounds that they began after the test year, are not known and measurable, and might be offset by benefits to ratepayers. The benefits mentioned by the commission are fuel savings, reduced cost of purchased power, and sale of surplus power. The company responds that these three items will benefit the ratepayers directly through the rate ERC (Energy Cost Recovery). ERC adjusts customers' bills for cost of fuel, and the company asserts that the cheaper nuclear fuel and savings from increased generation will enter this adjustment directly, so the commission erred in suggesting these benefits should offset the capital costs of Farley II.
The other aspect of the commission's decision not to consider Farley II relates directly to the use of a test year period. The commission contends that the test year figures will be invalidated if adjustments are made to reflect some post-period changes but not others. Thus they attempt to disallow all changes. This practice subverts the principle that rates are set for the future.
A difficulty arises here in connection with the statutory mandate to the commission about setting rates. Until 1978, §37-1-80 included in the value of a utility's property "the amount of the new investment *Page 773 
to be added in the year immediately following the test period used in arriving at the value of such utility's property." This language was deleted by Act No. 850 of the 1978 legislature. The deletion of this language does not allow the commission to ignore all changes subsequent to the test year. In the first place, such treatment would very likely result in confiscation. If rates are prospective, they must correspond to the actual needs of the company during the time they are in effect.
In Alabama Gas Corp. v. Wallace, 293 Ala. 594, 308 So.2d 674
(1975), this Court held that under the prior version of §37-1-80 the commission must consider all new investment for the year following the test period. The amendment can change this requirement, but it cannot preclude the commission from considering proper items of expense and revenue which will have a substantial bearing on the company's rate of return.
Finally, we do not consider the effects of Farley II to stem from new investment during the year following the test period. The investment in Farley II was made over the years of its construction; the expenses now associated with its operation are for the sake of recovering investment already made in the plant.
The company also argues for an attrition allowance to correct the historical failure of actual returns under commission orders to provide the rate of return deemed reasonable in the orders. The company supplied exhibits showing the last five rate orders, the allowed rate of return, and the actual returns which, in every case, fell below the allowed rate. The company's brief cites transcript pages for witnesses' proposed methods for overcoming this attrition.
The commission in brief responds, inter alia, that such an attrition allowance is an attempt to guarantee the company a certain rate of return, which is an unfair and inappropriate advantage for a regulated industry already protected from competition. This Court can not address this issue in the case as it stands, however, because the commission's order neither addresses the proposed attrition allowance nor even establishes a fair rate of return.
The request by Crowder to have Commissioner Greer and Commission President Camp disqualified for public remarks made during the hearings, or to have this Court set rates without remanding to the commission, is denied. Crowder's contention is that commissioners should not make statements indicating they have decided the case before all the evidence is submitted. While this argument has some merit, the relief sought is outside the scope of this Court's function in rate cases.
In conclusion, we note that there is no evidence or contention by the commission or any intervenors that the basic data submitted by the company were inaccurate or that the company was guilty of inefficient or dishonest management (see
Code 1975, § 37-1-80). Because the 12.43% return on equity found by the commission is not supported by the evidence and is confiscatory, because the zero order does not allow even this rate of return, and because the commission did not consider the effects of the Farley II nuclear plant, we reverse the zero order and remand this cause to the commission. Under the undisputed evidence in this case and our review of the record a 15% return on equity is the minimum which would not result in confiscation.
The briefs point out that the company has another rate increase pending before the commission. The commission on remand should consider the updated evidence and establish rates which are not confiscatory. The evidence and the monthly reports submitted to this Court clearly show that the company has been suffering confiscation of its property for some time. Therefore, the commission is hereby ordered to issue a new order as soon as possible, and in no event later than December 1, 1982. This Court hereby retains jurisdiction of this cause.
REVERSED AND REMANDED WITH DIRECTIONS.
TORBERT, C.J., and FAULKNER, JONES, ALMON, SHORES, EMBRY, BEATTY and ADAMS, JJ., concur.
MADDOX, J., not sitting.
[1] Appendix A consists of the commission's order, which is photocopied from the record filed in this Court.
[2] Prior to 1978, the sentence ending "as of the most recent date available," continued with "and the amount of the new investment to be added in the year immediately following the test period used in arriving at the value of such utility's property." This was called the "adder clause," and we shall discuss it in connection with the commission's treatment of events occurring after the test year.
[3] As further evidence of the confiscatory effect of the commission's zero order, the company points out that as of October 1981, its indenture coverage has fallen below 2.00x, the minimum under which the company can sell additional preferred stock or first mortgage bonds. This inability to capitalize forces the company to borrow at extremely high short-term interest rates.
This Court recently held in General Telephone Company of theSoutheast v. Alabama Public Service Commission, [Ms. August 6, 1982], ___ So.2d ___ (Ala. 1982), that common stock does not have to yield higher returns than bond rates. Still, the return allowed by the commission must be supported by the evidence and must be nonconfiscatory.
[4] The commission may not thus force the company to undergo confiscation until a new rate request can be filed, suspended, and acted upon. "Present confiscation is not atoned for by merely holding out the hope of a better life to come." WestOhio Gas Co. v. Public Utilities Comm. (No. 2), 294 U.S. 79,83, 55 S.Ct. 324, 325, 79 L.Ed. 773 (1935). *Page 774 
 APPENDIX A
ALABAMA POWER COMPANY, * PETITION: For approval of * new schedule of rates for Petitioner * retail electric service. *
* DOCKET NO. 18117 *
* IN RE: Lifeline Rates * Section 114, PURPA *
* DOCKET NO. 18004
 ORDER OF THE COMMISSION
BY THE COMMISSION:
On March 19, 1981, Alabama Power Company (the Company) filed a new Schedule of Rates designed to increase retail revenues by $324.9 million annually. These rates, with an effective date of April 18, 1981, were based on the twelve-month period ending November 30, 1980, and represented an increase of approximately 24.4%.
On April 20, 1981, the Company subsequently updated its test period to the twelve months ending March 31, 1981.
Also included in its filing letter was a request that the suspension period not exceed four months. On April 6, 1981, the Commission, after careful deliberation, suspended the operation of the proposed rates through October 18, 1981, as we were of the opinion that the rate filing warranted. an investigation and attendant public and evidentiary hearings, none of which could be accomplished thoroughly within a four-month period.
The Commission merged and consolidated Docket No. 18117 with Docket No. 18004 on June 18, 1981. Docket No. 18004 had been scheduled to be held June 24, 1981, in compliance with Section 114 of the Public Utility Regulatory Policies Act which required all commissions not having a Lifeline Rate to hold hearings to determine whether a Lifeline Rate should be established. As a result of scheduling problems and other just reasons, we postponed the hearing on Docket No. 18004 and merged it with Docket No. 18117, which was scheduled to commence on June 29, 1981. *Page 775 
The Lifeline issue is an important issue which requires additional evaluation by the Commission. (See ordering paragraph, infra.)
Petitions to intervene were filed by the Attorney General of Alabama; John Paul Ripp; United States Steel Corporation; Ellie B. Shaw, et.al., collectively known as the Community Action Group; Robert S. Crowder; Nancy Rawls, et al., collectively known as the Alabama Consumers Alliance; Airco, Inc., et al., collectively known as the Industrial Group; Rubin Morris Hanan, et al., collectively known as the Alabama League of Aging Citizens; Mrs. Dorothy Greenlee Jackson; Larry Petersen, a representative of the Alabama Council on Human Relations; United States Army Legal Service Agency; Municipal Electric Utility Association of Alabama; Nettie Pendleton, et al., represented by Legal Services Corporation of Alabama.
The Commission granted all requests for intervention and allowed the hearings to commence June 29, 1981.
There is no law which requires any member of this Commission when sitting as a Commissioner to leave his common sense at home or to refuse to take knowledge of common sense economic facts known to every citizen of Alabama.
We know, individually, and as citizens, ratepayers, and consumers, as well as Commissioners, that:
 — Over the past few years, and at the present, this State and the Nation have experienced the highest rate of inflation in the history of modern memory.
 — Over the past few years, and at the present, this State and the Nation have experienced the highest rate of interest for the consumer in the history of modern memory.
 — Over the past few years, and at the present, this State and the Nation have experienced the highest rate of unemployment in the history of modern memory, particularly among the poor, uneducated, and disadvantaged. *Page 776 
 — Over the past few years, and at the present, the State of Alabama is among the Nation's low in per capita income.
 — Over the past few years, and at the present, the average wage-earner/consumer in this State has expended a greater and greater percentage of his take-home wages for utility bills, which in many cases have relegated food, clothing and shelter to the back seat.
 — Over the past few years, and at the present, fixed income persons such as the disabled and retired have been especially burdened by mounting utility rates, and these citizens and others are literally crying out for help and relief.
 — Over the past few years, and at the present, this State is in the grimmest financial times since the Great Depression of the early 1930's.
Faced with these common-sense economic facts, we are presented with a rate increase request of $325 million, viz, a 25% increase by this Company which has received combined increases of 30.9% from this Commission over the. past two years.
We do not think the public can stand, or will stand for, this amount of increase or anything that approaches it. This Commission is deluged with complaints and pleas, most often attended with anguish and despair, from customers who just can't pay their utility bills, but who cannot live humanely without the service.
This Commission, therefore, is faced in this rate case with the perplexing statutory mandate of establishing rates for the Alabama Power Company which "shall be reasonable and just toboth the utility and the public." § 37-1-80, Code of Alabama
(1975), emphasis added. It is our considered opinion that given the present economic crisis, an increase in rates at this time would violate this Commission's statutory mandate to the public. *Page 777 
While the Company might experience some financial difficulties by this order, we perceive our duty to be clearly summarized as follows:
 The interest both to the public and of the utility should be considered, but it is not always possible to do full justice to both, and where this is the case, the rights of the public must prevail. 64 Am.Jur. 2d, Public Utilities, § 191.
Thus, we feel duty-bound to deny this rate increase. Additionally, we are mindful of the level of the Company's recently earned returns and profits. Said returns are set out below.
There are three pertinent factors which add to our decision to turn down the Company's request at this time. Summarily, these are:
 1. The timeliness of the Company's request in view of the $80 million increase of last year; and the combined $288 million increases over the past two years. There has been simply insufficient time to evaluate all the financial ramifications of these increases, especially the last increase which was in effect for only part of the test year.
 2. The unknown benefits and burdens of considering a major plant (Farley II at a cost of $748 million plus) which was not in service until four months after the test year ended and the associated speculative and conjectural adjustments.
 3. The dogged insistance of the economic experts that rate of return and corresponding return on equity to the utility monopoly must be artificially high (16 to 18.5 percent) since interest rates are artificially high — this concept puts the utility and its stockholders, enjoying no competition, in the enviable position of earning, at the expense of the public ratepayer, a profit greatly in excess of the earnings and profits of other industries which are fighting both the competitive market and the ravages of inflation and high *Page 778 
interest. (See the earnings and profits of any manufacturer, wholesaler or retailer in automotive, housing, construction, timber, or textile industries over the past year or so which are reported in all financial publications.)
Specifically, the Commission is of the opinion that the focal issue in this case cannot rest with the record which was established primarily by highly paid experts representing the Company. Rather, the Commission is convinced that the exercise of our legislative/judicial duty, as mandated in Title 37, Codeof Alabama (1975), makes it encumbent upon us to assess this asking from a broader perspective. Given the unique circumstances of this asking, we are persuaded that this is the only perspective which will yield "rates and charges . . . reasonable and just to both the utility and the public."
On July 19, 1979, the Commission granted this Company $208 million or 24.173% increase. Effective July 30, 1980, the Company received another $80 million or 6.7% increase. Thus, in a twelve-month period the Commission increased rates some $288 million annually or approximately 30.9%! This has placed a tremendous burden on the electric ratepayers of Alabama. However, such action was necessary as the Company, in opting not to file for rate relief on a timely basis (when Farley I became operational in December 1977), but rather, to pursue relief via a complaint case filed by then Governor Wallace(Honorable George C. Wallace, as Governor of the State ofAlabama and the State of Alabama vs. Alabama Power Company), APSC Docket No. 17439, had allowed its return to plummet from a high of 14.54% (obtained pursuant to relief granted in Docket 17261) in November 1977, to a low of 3.74% in July, 1979. Though the Commission granted rate relief of some 25% in the "complaint case" as filed by the Governor (supra) in Docket 17439, the Court overturned the order holding that the Commission "did not afford due notice to all interested *Page 779 
parties and an opportunity for such parties to present evidence . . ." and, therefore, was void on its face.
We recite the above to show that the Commission has indeed been responsive to this Company's financial condition in the recent past as evidenced by the fact that rate relief has been granted 4 times since late 1978 — 4 times in 3 years. This recognition and rectification of the Company's past distressed position has, however, caused distress and duress to the ratepayers. Continuing this situation, in our view, does not comport with the equity that we envision to be embraced within our legislative mandate to insure ". . . reasonable and just [rates] to both the utility and the public."
The magnitude of the recent increased rates can be gauged if one considers that in only 20 months the earnings of the Company expanded from 3.74% return on some $992 million of equity to a 12.4% return on over $1 billion of equity at March 31, 1981.
The Company was earning 12.43% on equity for the twelve months ending March 31, 1981, the test period before us for review. Further, we note the Company has continually experienced returns in that range — twelve months ending:
April 30, 1981 — 12.61%
May 31, 1981 — 12.72%
June 30, 1981 — 12.61%
July 31, 1981 — 13.07%
We are now asked to increase base rates another 25% largely predicated on the testimony of Company experts whose independence, at best, can be considered suspect given their employment arrangements with the Company. To our knowledge utility regulation is an art and not a science. It is, therefore, largely judgmental.[1] If it were not, some *Page 780 
detailed mathematical, scientific formula would have, no doubt, been proposed by now to handle regulation and our offices/positions abolished. Obviously, our legislature and, indeed, the legislatures of the majority of the states of this Nation do not feel that utility regulation has evolved to the point where judgment is no longer needed, for they have not abolished our offices/positions. The People of the State of Alabama have elected us to use our best judgment and, indeed, have entrusted us with the authority and obligation to exercise that judgment in the public interest.
Our exercise of that judgment compells us to conclude that the present record is skewed, one-sided and devoid of the comprehensive perspective we feel is essential in balancing the equities. We do not hold doctorates of philosophy, certifications in public accounting, or registrations as professional engineers. Published treatises on investor perceptions we cannot boast of. However, we do have the public trust to uphold and we did take our oaths armed with the integrity necessary to "call the shots" as our conscience and judgment dictates. We do not intend undue criticism or wholesale indictments. We are not conveniently supplanting our judgment for that of the persons paraded before us in this proceeding. We are, however, invoking that judgment we were elected to exercise — and indeed are obligated to exercise — in order to insure the public interest is protected.
Exercise of that judgment convinces us that the evidence presented did not encompass or evaluate all aspects of the issues. For example:
 (a) We are not satisfied that the financial position of the Company as given at March 31, 1981, and adjusted for Farley II, truly reflects all of the effects of a Farley II had it been operational during the test period. If we are to require ratepayers to pay a return on approximately $748 million of investment, which has been superimposed on a period on a theoretically simulated basis, it is our sworn duty to ensure that the ratepayers are receiving all the benefits *Page 781 
appertaining thereto. We are not convinced, based on the data supplied, that this is the case in the instant docket;
 (b) We are concerned that the data in this proceeding requires the ratepayers to pay all the capital costs for Farley I, its operational costs, as well as, the costs of energy purchased because Farley I was "off line" six (6) months of the test period. Further, no adjustment has been made to the revenue and expense relationships established in this test period which would afford the consumer the benefit of this situation being corrected. We would certainly hope a 50% "off line" status would not be a norm anticipated by the Company. If it is, capital costs adjustments may be warranted; if it is not, some adjustment would be needed to properly state the revenue-expense relationships of the test period; and
 (c) We are concerned about the propriety of costs incurred by the Company. A case in point is the $7 million of expense which the Company seeks to recoup in connection with the abandoned Barton nuclear facility. We understand in excess of $14 million associated with this abandonment have already been borne by ratepayers in their rates. We can find no definitive ruling on the treatment of these costs for ratemaking purposes by this Commission or past Commissions. Therefore, we are understandably interested in such costs and their propriety.
To reiterate, these are unprecedented economic times in modern memory. Accordingly, we must weigh the plight of other Alabama industries and businesses — for example, the textile industry which is earning a 2.5% return on investment, per a witness in this proceeding, and the plight of Alabama ratepayers whose per capita income is, unfortunately well below the national average, against the current earnings of Alabama Power Company. In that context, we find Alabama Power Comapny's earnings adequate and, at least for the present, affording the Company a fair net return on the reasonable value of its property devoted to the public service. As the President of our Nation and the Governor of our State has called upon all of us to conserve and cut costs, so too do we call upon Alabama Power Company to employ conservative, cost-cutting measures.
We were informed by the Company after our vote in this proceeding that the Economic Recovery Tax Act of 1981 which became law on August 13, 1981, imposed on the Company certain requirements relating to deferred tax normalization accounting for public utility property placed in service *Page 782 
after December 31, 1980. We are informed that in order for the Company to utilize new depreciation guideline rates contained in the Act, normalization between book depreciation and the accelerated cost recovery system (ACRS) depreciation allowance is mandatory for both depreciation and investment tax credits. Essentially, the Company no longer has the option to flow through the difference between the asset depreciation range (ADR) midpoint tax straight-line rate and the book straight-line rate on property placed into service after December 31, 1980.
The Act requires that the Company comply with the new normalization requirements and that this Commission recognize the changes required by such compliance in this order if the Company (and ultimately the ratepayers) is to enjoy the benefits associated with accelerated depreciation for property additions in 1981. We recognize that the Company is fully normalizing for 1981 property additions and therefore, satisfies the requirements of the Economic Recovery Tax Act of 1981.
In establishing Rate ECR, the Commission separated fuel costs from base rates. To comply with this, the Alabama Power Company filed new base rates effective July 1, 1981 which excluded all fuel costs. Per the wording on the Company filed tariffs, these base rates were "[e]ffective through October 19, 1981, when new rates will be established by final order in Docket 18117."
Having addressed the denial of the Company's filing and the basis for our ruling, the Commission orders as follows:
IT IS ORDERED BY THE COMMISSION, that the rate schedules as filed by the Company on March 19, 1981, are hereby denied. Said rate schedules include rate FD, HLF, LAF, LFS, LPEM, LPEL, LPS, LPM, LPL, OFP, PG, RN, RS, RT, SLM, XTP, XWP; the annual interruptible credits increase; the Special Rules Governing the Application of Commercial and Industrial Rates; and any other filings of said date.
IT IS FURTHER ORDERED that all rates, charges, schedules, and tariffs in effect on July 1, 1981 are to remain in effect. *Page 783 
These include all rates filed in connection with Rate ECR and all other rate schedules in effect on July 1, 1981 and not affected by Rate ECR.
IT IS FURTHER ORDERED that the Company shall comply fully with the tax normalization accounting requirements of the Economic Recovery Tax Act of 1981 and related rules and regulations for so long as said Act, rules and regulations remain the law of the United States.
IT IS FURTHER ORDERED that the Commission, having hereby issued its order with respect to the proposed increased rates filed by the Company in Docket 18117, the Commission orders that Docket 18004 be bifurcated and that Docket 18004 be kept open for subsequent rulings on the Lifeline issue, Section 114 of Public Utility Regulatory Policies Act of 1978 (PURPA). Changes or alterations in any of the revised schedules which may result from further orders in this PURPA aspect of the proceeding shall not increase or decrease the total revenue level to which the Company is entitled under this order.
IT IS FURTHER ORDERED that this Order shall be effective as of the date hereof.
Jurisdiction in this cause is retained for any further proceedings which the Commission may deem necessary.
DONE this the 16th day of October, 1981, at Montgomery, Alabama.
ALABAMA PUBLIC SERVICE COMMISSION
Billy Joe Camp, President
Lynn Greer, Associate Commissioner
Jim Folsom, Jr., Associate Commissioner
ATTEST:
Wallace Tidmore, Secretary
[1] "The ultimate question of a fair rate of return should not be a composite of the results mechanically reached by these formulae, with little regard given to the question sought to be determined, that is, the fair rate of return." ContinentalTelephone Co. vs. Alabama Public Service Commission,376 So.2d 1358 (Ala. 1979). *Page 784 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.]