773 F.2d 362
 249 U.S.App.D.C. 99
 ALABAMA POWER COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Texas Power & Light Company, Georgia Power Company, et al.,
Mississippi Power & Light Company, Group W Cable,
Inc., Intervenors.
 No. 83-2191.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 27, 1984.
Decided Sept. 24, 1985.
 
 Petition for Review of an Order of the Federal Communications commission.
 Samuel Eason Balch, Jr., Birmingham, Ala., of the bar of the Supreme Court of Alabama, pro hac vice, by special leave of the Court and Daniel J. Wright, with whom Peyton G. Bowman, III, Washington, D.C., were on brief, for petitioner and intervenors, Texas Power & Light Co., et al.
 Gregory M. Christopher, Counsel, F.C.C., Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Bruce E. Fein, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Barry B. Grossman and George Edelstein, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents. Jane E. Mago, Atty., F.C.C., and George Edelstein, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondents.
 
 
 1
 Paul Glist, Washington, D.C., with whom Gardner F. Gillespie, Washington, D.C., was on brief, for intervenor Group W Cable, Inc. Jay E. Ricks and Ann D. Jordan, Washington, D.C., also entered appearances for Group W Cable, Inc.
 
 
 2
 John R. Molm, Robert P. Edwards, Jr. and E. William Henry, Atlanta, Ga., were on brief for intervenors, Georgia Power Co., et al.
 
 
 3
 Before BORK and SCALIA, Circuit Judges, and HOGAN,* District Judge.
 
 
 4
 Opinion for the Court filed by Circuit Judge BORK.
 
 
 5
 BORK, Circuit Judge.
 
 
 6
 Alabama Power Company petitions for review of a determination by the Federal Communications Commission that the pole attachment rates it had been charging Group W Cable, Inc. were higher than the maximum permitted by the Pole Attachment Act, 47 U.S.C. Sec. 224 (1982). Because we find that the Commission did not fairly and accurately calculate the maximum allowable rate, we vacate its order and remand to the Commission for further proceedings consistent with this opinion.
 
 I.
 A.
 
 7
 It has been the general practice of the cable television industry since its inception to lease space on existing distribution poles owned by electric utilities and telephone companies in order to attach its coaxial cables and related equipment.[1] Cable operators typically enter into leasing agreements with the company owning the pole providing for the payment of a periodic fee plus reimbursement for all additional pole costs made necessary by the cable attachments. Concern over the ability of utilities and telephone companies to extract monopoly profits from cable operators in need of pole space led Congress, in 1978, to enact the Pole Attachment Act, Pub.L. No. 95-234, Sec. 6, 92 Stat. 33, 35 (codified as amended at 47 U.S.C. Sec. 224 (1982)), conferring jurisdiction on the FCC to:
 
 
 8
 regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable, and ... adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions.
 
 
 9
 47 U.S.C. Sec. 224(b)(1). A rate would be considered just and reasonable if it:
 
 
 10
 assure[d] a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space ... which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole....
 
 
 11
 47 U.S.C. Sec. 224(d)(1). It is the task of the Commission, therefore, to ensure that the pole attachment rates charged cable operators do not fall below the statutory minimum--incremental costs--or above the statutory maximum--fully allocated costs.
 
 
 12
 Following passage of the Pole Attachment Act, the FCC instituted a complaint procedure that "focuses on the upper end of the zone of reasonableness." Brief for Respondents at 6. To calculate fully allocated costs, the Commission has adopted the following formulaic representation of the statutory definition:
 
 
 13
 Maximum = Space Occupied by CATV x Operating k Capital Costs
 
 
 
 Rate Total Usable Space Expenses of Poles
 Teleprompter Corp. v. Alabama Power Co., Mimeo No. 1808 (released June 29, 1981) ("Bureau Order") at 2, Joint Appendix ("J.A.") at 152; see also 47 C.F.R. Sec. 1.1409 (1984). In practice, however, the Commission first determines the net cost of the pole, then multiplies that amount by a percentage figure that reflects operating expenses (also referred to as "carrying charges"), and then multiplies the product by the percentage of pole space used by the cable operator. See, e.g., Bureau Order at 3, J.A. at 153; Teleprompter Corp. v. Alabama Power Co., File No. PA-81-0014 (released Nov. 3, 1983) ("Commission Order") at 7, J.A. at 297. The formula actually used--identical for all purposes to the one shown above--can therefore be expressed as follows:
 Maximum Rate = Space Occupied by CATV x Net Cost x Carrying
 
 
 
 14
 Total Usable Space of Pole ChargesThe Commission determines the cost of the pole by subtracting the depreciation reserve and the amount attributable to "non-cable-related investment" from the gross investment in pole plant, Brief for Respondents at 7, and the figure for carrying charges encompasses the costs of administration, maintenance, depreciation, taxes, and capital.
 
 B.
 
 15
 In December of 1980, Group W,[2] an owner and operator of cable television systems, filed a complaint with the Commission alleging that the pole attachment rates charged by Alabama Power were "unjust and unreasonable." J.A. at 1, 6. At the time, Group W was leasing space on approximately 22,000 poles owned by Alabama Power, most at the annual rate of $3.00 per pole.[3] Group W claimed in its pleadings that the maximum allowable rate was $1.45 per pole. Id. at 6. In an order issued in June of 1981, the Acting Chief of the Common Carrier Bureau held that the maximum annual rate that should be allowed Alabama Power was $1.13 per pole. Bureau Order at 8, J.A. at 158. The existing rates were therefore held to be unjust and unreasonable, id., and Alabama Power was ordered to make refunds to Group W retroactive to the date on which the complaint had been filed.
 
 
 16
 Alabama Power filed an application for review of the Bureau Order with the Commission one month later, charging that the Bureau had made several mathematical, conceptual, and legal errors. The Commission granted the application in part, but affirmed the Bureau on several key issues of contention. Commission Order, J.A. at 291. The Commission determined that the maximum allowable annual rate was not $1.13 per pole, as the Bureau had found, but $1.56 per pole, and ordered Group W to remit the excess refunds it had received. Since the maximum allowable rate as determined by the Commission was still lower than the rate that had been contractually agreed upon between Alabama Power and Group W, the contracts between the parties were modified to provide that thereafter the Commission's figure would be the rate charged.
 
 
 17
 In its petition for review before this court, Alabama Power challenges several aspects of the Commission's calculation of the maximum allowable rate. Specifically, Alabama Power raises the following claims:
 
 
 18
 1. The Commission's calculation of net pole costs contained a significant mathematical error.
 
 
 19
 2. The Commission improperly excluded from net pole costs the expenses incurred by the utility in providing guy wires and anchors.
 
 
 20
 3. The Commission failed to calculate accurately the general and administrative expenses.
 
 
 21
 4. The Commission improperly prohibited Alabama Power from normalizing its deferred tax expenses.
 
 
 22
 5. The Commission adopted a rate of return that had been held invalid under Alabama state law.
 
 
 23
 The first two claims relate to the determination of net pole investment, and we deal with them in Part III. The latter three claims relate to the determination of carrying charges, and we deal with them in Part IV.
 
 II.
 
 24
 At the outset, we must determine the appropriate standard by which to judge the validity of the Commission's calculation. Alabama Power claims that in attempting to compute fully allocated costs the Commission erred and reached a result that falls well below the statutory maximum. While the Commission contests most of Alabama Power's charges of error,[4] it argues as well that any error committed is presumptively harmless. The Commission contends that because the statute requires only that rates fall within a zone of reasonableness, and because the Commission was attempting to calculate the upper end, any result that falls short of the mark--although the product of error--is likely to be within the boundaries defined by the statute as just and reasonable. The Commission proffers no evidence or findings to support its assertion that the $1.56 rate is above incremental costs,[5] but urges that the burden of proof be placed upon petitioner. In other words, regardless of whatever mistakes it made in calculating the maximum rate, the Commission argues that its order cannot be disturbed absent a showing by Alabama Power that the Commission's rate is below the statutory minimum.
 
 
 25
 We cannot agree. In the memorandum opinion we review, the Commission determined that $1.56 per pole was the "maximum rate." Commission Opinion at 7, J.A. at 297. In the papers filed before the Commission, both parties focused exclusively on the question of whether the Bureau had correctly calculated the maximum rate. See Application for Review, J.A. at 161; Opposition to Application for Review, J.A. at 191. Thus, in the proceeding below, the Commission never even attempted to determine Alabama Power's incremental costs. It heard no evidence, and made no findings, bearing on a determination of the statutory minimum rate.[6] It has long been settled doctrine that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). We will not uphold agency action simply because "findings might have been made and considerations disclosed which would justify its order...." Id. at 94, 63 S.Ct. at 462. Accord FPC v. Texaco Inc., 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962); SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). The rationality of administrative decisionmaking can only be assessed by reference to the agency's stated objectives. We refuse to speculate on whether or not the end result of an agency's flawed analysis could, in fact, have been legitimately reached under a theory upon which the agency never relied.
 
 
 26
 Indeed, a determination of incremental costs would not have been germane. The existing contracts between Alabama Power and Group W provided for a rate of $3.00 per pole. These proceedings began when Group W filed a complaint charging that a $3.00 fee was "unjust and unreasonable, and therefore unlawful." J.A. at 6. Group W therefore had the burden of demonstrating that the rate it was being charged was higher than the law permitted.[7] Absent such a demonstration, the complaint would necessarily have been dismissed, pursuant to Commission regulations. See 47 C.F.R. Sec. 1.1409(d) (1984). The Commission's exclusive focus on the upper end of the zone of reasonableness was thus a product of both the posture in which this case arose and the plain language of its own regulations.[8] We will therefore judge the validity of the order by examining whether the Commission in fact calculated that which it sought to calculate, and determine whether the $1.56 fee is what the Commission claims it to be--the maximum statutory rate.[9]
 
 III.
 
 27
 In calculating net pole investment, the Commission sought to eliminate all non-cable-related investments. Upon review, we find that the Commission used a clearly erroneous method for computing the non-cable-related investment, and we also find that the Commission improperly excluded the costs of guys and anchors as non-cable-related.
 
 
 28
 In order to appreciate the methodological error made by the Commission, it is helpful to examine first the calculations presented to it by Group W. Opposition to Application for Review, J.A. at 191, 208. Group W took the figure for gross pole investment, excluding lightning arrestors and grounds,--$175,819,167--and subtracted from it the figures for depreciation and for non-cable-related investment.[10] This difference was then added to the costs of lightning arrestors and grounds (minus depreciation), costs both parties agreed were cable-related. The sum of that addition was what Group W claimed to be the net investment by Alabama Power in pole expenses applicable to cable attachments.
 
 
 29
 When the Commission made its calculation, it used a percentage figure to eliminate the non-cable-related investment from the gross pole investment. The Commission calculated this percentage (41.43%) by dividing the figure provided by Group W for gross non-cable-related investment ($72,840,638) by the figure provided by Group W for gross pole investment, excluding lightning arrestors and grounds ($175,819,167).[11]
 
 
 30
 However, the Commission proceeded to apply this percentage figure to gross pole investment including the costs of lightning arrestors and grounds. The error is apparent. The entire cost of lightning arrestors and grounds (minus depreciation) ought to have been included in the figure for net pole investment, but the Commission instead reduced that cost by a percentage figure. Since the costs of lightning arrestors and grounds were conceded by both parties to be wholly cable-related, the Commission erred by discounting the costs through the use of a wholly irrelevant percentage figure.[12]
 
 
 31
 We believe the Commission made an additional error when it excluded the cost of guys and anchors from the category of capital costs by classifying it as a non-cable-related investment. Guy wires and anchors are used to counteract the stress caused by wind, storms, the turning of corners and the attachment of wires. They keep the pole standing and therefore benefit all its users.
 
 
 32
 The Commission reasons that so long as Group W provides whatever additional guys and anchors are made necessary by the additional stress created by the cable attachments, it need not reimburse Alabama Power for a proportionate share of the expense already incurred to anchor the pole. That, however, is only a calculation of incremental costs, and is inconsistent with the statutory definition of the maximum rate. The statutory language is quite clear: the maximum rate is calculated by "multiplying the percentage of the total usable space ... which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right of way." 47 U.S.C. Sec. 224(d)(1) (emphasis added). The Senate Report is no less precise, and explains that "[t]he term 'operating expenses and actual capital costs of the utility,' as used in S.1547, as reported, refers to the costs to the utilities, irrespective of the CATV attachment, of owning and maintaining poles." Senate Report at 19-20 (emphasis added). The expense of providing guys and anchors is clearly a cost necessary to the maintenance of Alabama Power's poles.[13] Requiring contribution from Group W does not require the cable company to subsidize a cost from which it derives no benefit; even when the guys and anchors serve merely to counteract the stress created by the electric utility wires, they nevertheless provide Group W with an essential service by bracing the poles and holding them upright. As counsel for the Commission conceded at oral argument, were Alabama Power to decide that the holes in which the poles were placed needed to be dug deeper in order to better brace the pole, Group W would be required to pay a proportionate share of the digging costs. Whether the pole is braced by digging deeper holes or by attaching extra guy wires, the principle is the same. We therefore hold that the Commission may not exclude the cost of guys and anchors from net pole investment.[14]
 
 IV.
 
 33
 To compute carrying charges, the Commission determines the percentage of pole investment devoted to each of five categories of expenses: administration, maintenance, depreciation, taxes, and cost of capital. The percentage figure for carrying charges is simply the sum of these five calculations. Alabama Power disputes the Commission's calculation of administrative expenses, its calculation of taxes, and its calculation of the cost of capital. We deal with each in turn.
 
 A.
 
 34
 In calculating the percentage figure for general and administrative expenses, the Commission divided the sum of four separate accounts--administrative and general salaries, office supplies, administrative expenses transferred credit, and regulatory commission expenses--by net plant investment. Commission Order at 6, J.A. at 296. Alabama Power argues that the Commission ought to have included nine other accounts as well, claiming that these other accounts were just as applicable to the service provided Group W as the four that were included.[15] The Commission explains in its brief that "[w]hile there may be some cable-related items buried in [the excluded] accounts, it should also be noted that the accounts which are included contain not only cable-related items but also non-cable-related items." Brief for Respondents at 16-17.
 
 
 35
 The degree to which each of these accounts is cable-related is an issue we need not decide, for the Commission was clearly in error when it chose to use only cable-related accounts in calculating administrative costs. The Commission was seeking to determine the percentage of investment devoted to administrative and general expenses. When that percentage is multiplied by the net pole investment, it will yield a reasonable estimate of the administrative and general expenses incurred in the maintenance of Alabama Power's poles. In order to determine that percentage, the Commission could have divided pole-related administrative expenses by pole-related investment, cable-related administrative expenses by cable-related investment, or total administrative expenses by total plant investment.[16] 6] Instead, the Commission restricted the numerator to cable-related administrative costs and divided it by a denominator that represented total plant investment. Such a division necessarily yields an artificially low percentage. Dividing pole-related administrative costs by pole-related investment produces the valid figure, and dividing either cable-related administrative costs by cable-related investment or total administrative costs by total investment generates a reasonable approximation. The fraction used by the Commission, on the other hand, bears no rational relationship to the determination it purports to make.
 
 B.
 
 36
 The Commission has refused to allow Alabama Power to normalize its tax expenses in establishing cable attachment rates. Instead, the Commission has employed the flow-through method of accounting to calculate fully allocated costs. Alabama Power challenges this policy, and contends that the normalization of tax benefits does not render an otherwise acceptable rate unjust and unreasonable.
 
 
 37
 This issue of accounting arises whenever a utility defers some of its current tax liabilities. If the deferred taxes are normalized, then the rates are calculated to reflect the full tax liability in the year in which that liability is incurred. Under flow-through, in contrast, the benefit of the deferral is passed on to the ratepayers, and each year's rates reflect only the cost of those taxes actually paid that year by the utility. Advocates of flow-through claim that it serves to ensure that rates reflect only those expenses actually borne by the utility, while opponents argue that only through normalization can expenses be matched to the customer that receives the related services. See Public Systems v. FERC, 709 F.2d 73, 76 (D.C.Cir.1983).
 
 
 38
 The chief point of general dispute has centered on the question whether normalization provides the utility with a permanent tax savings. As long as the revenues and expenses of a utility continue to grow, the taxes postponed in each year will more than offset the past liabilities that come due. Critics of normalization contend that this continuing offset represents a tax savings which should be reflected in the rates; supporters of normalization argue that the "savings" is illusory, since every liability deferred does in fact become due at the appropriate time.
 
 
 39
 In the order presently under review, the FCC justified its use of flow-through with a citation to one of its previous orders, Television Cable Service, Inc. v. Monongahela Power Co., 88 F.C.C.2d 56 (1981). Commission Order at 6, J.A. at 296. The analysis given in Monongahela --which appears to be the most complete discussion that the FCC has given this issue as it relates to pole attachments--consists of the following paragraph:
 
 
 40
 We find no merit in this [normalization] approach. The accrued tax figure reflects certain deferrals and timing differences in tax payments which may not properly be attributed to the operating expenses and capital costs of poles Congress has directed us to consider. As we see it, using the actual taxes paid adequately assigns the company's tax expense to the cost of maintaining poles. At the same time, the actual figure avoids the possibility of apportioning to pole attachments taxes which may be deferred for an indefinite time.
 
 
 41
 88 F.C.C.2d at 59 (citation omitted).
 
 
 42
 In a more recent memorandum opinion, however, the Commission rejected as "unsound" a party's contention that normalization results in a permanent tax savings. The Commission noted that "the characterization of deferred tax reserves as permanent tax savings and the corresponding rejection of normalized tax accounting have been criticized by a number of commenters," and that both the accounting profession and Congress have resolved the debate in favor of normalization. Second Computer Inquiry, No. 81-893 (released May 15, 1985) at 32-33 n. 100. Although Second Computer Inquiry was not a pole attachment case, the general principle it applied is inconsistent with the terse explanation given in Monongahela. As we have noted, "an administrative decision may be found arbitrary and capricious on judicial review if the administrator, without comprehensible explanation, adopts a rationale in subsequent cases that yields decisions contrary to the decision under review." Dep't of Treasury v. FLRA, 707 F.2d 574, 581 n. 25 (D.C.Cir.1983). While we do not foreclose the possibility that the Commission might be able to reconcile its contradictory positions, nothing yet in the record successfully does so. In light of this unexplained inconsistency, we cannot uphold the Commission's decision to exclude normalized taxes from the calculation of the maximum rate.
 
 C.
 
 43
 The Senate Report that accompanied the Pole Attachment Act expressly authorized, but did not require, the Commission to employ the determinations made by state governments of the appropriate rate of return. Senate Report at 22. Relying on an opinion issued by the Alabama Public Service Commission ("APSC"), the FCC held that Alabama Power was entitled to a rate of return of 9.97%. Alabama Power challenges the use of that figure on the grounds that it had been held invalid under Alabama state law almost a year before the Bureau's decision to use it was affirmed by the Commission. Upon reviewing the various state law determinations, we conclude that Alabama Power's claim is a meritorious one.
 
 
 44
 The 9.97% figure for Alabama Power's rate of return originated in an opinion issued by the APSC in August of 1980, and was based on a finding of 14% return on equity. One week later, the Supreme Court of Alabama issued its decision in an appeal by Alabama Power of an earlier rate order, Alabama Power Co., APSC Docket No. 17667 (July 19, 1979). Alabama Power Co. v. APSC, 390 So.2d 1017 (Ala.1980). In this opinion, the Alabama Supreme Court found the Commission's decision to allow an 11.7% rate of return to be "arbitrary," id. at 1026, and remanded to the Commission with instructions to "enter an order based on the evidence." Id. at 1027. At the time, Alabama Power had an appeal of the more recent rate order--the one establishing the 9.97% rate of return and based on the 14% return on equity--pending before the Alabama Supreme Court. In March of 1981, in response to the joint request of Alabama Power and the APSC, that appeal was remanded to the APSC and the APSC then issued an order disposing of both the earlier and the more recent rate proceedings. That order granted Alabama Power a more substantial rate increase.
 
 
 45
 Following the issuance of this order, Alabama Power filed an application with the APSC for an additional rate increase. Its application was denied, Alabama Power Co., APSC Docket No. 18117 (Oct. 16, 1981), and its return on equity--12.43%--was held adequate by the APSC. This determination was reversed by the Alabama Supreme Court in Alabama Power Co. v. APSC, 422 So.2d 767 (Ala.1982). The Alabama Supreme Court found the 12.43% rate of return on equity to be "confiscatory," id. at 770, and held unanimously that "[u]nder the undisputed evidence in this case and our review of the record a 15% return on equity is the minimum which would not result in confiscation." Id. at 773. The court ruled that "[t]he evidence and the monthly reports submitted ... clearly show that the Company has been suffering confiscation of its property for some time," and remanded to the Commission. Id.
 
 
 46
 In light of this series of decisions, the 9.97% figure cannot be regarded as a valid rate of return under Alabama law. The 9.97% rate of return was implicitly superseded when the Commission, upon remand, increased the rate order for which it was employed, and the 14% rate of return on equity on which it was based has been held to be below the minimum required to avoid confiscation. The court decision holding that 15% was the minimum allowable rate of return on equity was issued on November 5, 1982, one year before the FCC issued its memorandum opinion and order, and the decision relied upon data from a test period that began before Group W's original complaint was filed with the FCC.[17]
 
 
 47
 We stress that the Commission is under no obligation to accept the Alabama court's determination of what rates constitute the minimum required to avoid confiscation. Regardless of the findings of the state court, the Commission is free to make its own calculation of what would constitute an adequate rate of return, and we will uphold that calculation as long as it meets the statutory requirements and is not arbitrary or capricious. However, where the Commission seeks to free itself from the necessity of making an independent determination by relying on the rulings of state courts and agencies, it may not, under that procedure, adopt determinations that have been invalidated under state law.
 
 V.
 
 48
 We find, therefore, that the Commission's somewhat casual calculations exhibit at several points the sort of "clear error[s] of judgment," Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971), and absence of "rational connection[s] between the facts found and the choice[s] made," Burlington Truck Lines, Inc. v. United States, 371 U.S. at 168, 83 S.Ct. at 246, that render an order arbitrary and capricious. We vacate the Commission's order and remand to the Commission for further proceedings consistent with this opinion.
 
 
 49
 It is so ordered.
 
 
 
 *
 Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. Sec. 292(a)
 
 
 [1]
 "Use is made of existing poles rather than newly placed poles due to the reluctance of most communities, based on environmental considerations, to allow an additional, duplicate set of poles to be placed." H.R.Rep. No. 721, 95th Cong., 1st Sess. 2 (1977)
 
 
 [2]
 The complainant was Teleprompter Corporation, Group W's predecessor in interest. During the pendency of the Commission proceeding, Teleprompter was purchased by Westinghouse Corporation and merged into Group W. For simplicity, we refer to complainant as Group W throughout this opinion
 
 
 [3]
 Group W paid an annual rental fee of $6.15 for each of 22 poles located in Dothan, Alabama. J.A. at 16
 
 
 [4]
 The Commission concedes error in its treatment of lightning arrestors and grounds, see Part III infra, but suggests that the error made only a "negligible difference in the final rate." Brief for Respondents at 18 n. 17
 
 
 [5]
 The Commission's brief mentions in passing that in a proceeding unrelated to the present action, Georgia Power Co. v. Columbus Cablevision, Inc., 55 Rad.Reg.2d (P & F) 940 (Mar. 20, 1984), petition for review pending sub nom. Georgia Power Co. v. FCC, No. 84-1107 (D.C.Cir. filed Mar. 21, 1984), it "found" Georgia Power's incremental costs to be less than one dollar. Brief for Respondents at 5 n. 4. We fail to see what relevance a calculation of Georgia Power's incremental costs has to this proceeding. In any event, no such calculation was ever actually made; the Commission was merely rejecting, on methodological grounds, a study by Georgia Power that purported to show incremental costs much higher than had been assumed
 
 
 [6]
 This appears to reflect standard procedure. See Cablevision of Augusta, Inc. v. Georgia Power Co., File Nos. PA-83-0013 et al., Mimeo No. 3314 (released Apr. 5, 1984) at 6 ("[I]t has been Commission practice to establish the maximum rate....")
 
 
 [7]
 The Senate Report accompanying the Pole Attachment Act indicated that the Commission would have the authority to assign burdens of proof in rate proceedings. S.Rep. No. 580, 95th Cong., 1st Sess. 22, reprinted in 1978 U.S.Code Cong. & Ad.News 109, 130 [hereinafter cited as "Senate Report"]. The Commission's regulations assign the complainant "the burden of establishing a prima facie case that the rate, term, or condition is not just and reasonable." 47 C.F.R. Sec. 1.1409(b) (1984). The Commission's authority below does not enable it, of course, to redistribute burdens and presumptions when challenged before this court
 
 
 [8]
 Because the Commission was seeking to determine the statutory maximum, we need not decide whether modifying the contracts so as to require Alabama Power to continue providing access at anything less than fully allocated costs would constitute failure to provide just compensation for what is clearly a taking. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982)
 
 
 [9]
 Our conclusion that this is the appropriate standard is bolstered by our review of the legislative history of the Pole Attachment Act. According to the Senate Report, it was not the intent of Congress "to require the Commission to embark upon a large-scale ratemaking proceeding...." Senate Report at 22. Congress enacted the statute in response to two related concerns: cable companies' dependence on existing poles enabled utilities to exact monopoly profits, and telephone companies in particular--as potential competitors to cable--were in a position to engage in anticompetitive practices. Id. at 13. While the Commission has some flexibility to evaluate the reasonableness of rates with reference to the services actually provided, id. at 19, the Commission was not expected to adjust rates that were already within the zone of reasonableness; its far more limited task is to police the borders. The Senate Report made this clear in describing the applicable procedure:
 The Commission's adjudicatory authority would not come into play until a complaining party has brought a matter to the Commission's attention. After hearing the complaint and responsive pleadings, if the Commission determines that a particular rate, term, or condition is unjust or unreasonable, it shall take any action it deems appropriate and necessary, including ordering the parties to undertake further negotiations to arrive at a just and reasonable settlement of the dispute to their mutual satisfaction. Alternatively, the Commission may order a party to show cause why it should not cease and desist from practices found to be unjust or unreasonable.
 Id. at 22 (emphasis added). In the context of an adjudication between parties under contract, therefore, a determination that a fee is outside the statutory zone is a prerequisite to rate adjustment by the Commission.
 
 
 [10]
 While the parties dispute what costs ought properly be included as non-cable-related investments, the Commission's calculation method was erroneous regardless of which costs are included
 
 
 [11]
 At one point in its calculation, the Commission referred to a figure of 43.43%. J.A. at 293. We read that as a typographical error. Elsewhere in its memorandum opinion, the Commission used the 41.43% figure, and the product of its multiplication is clearly based upon the lower figure
 
 
 [12]
 The Commission concedes this error in a footnote to its brief but implies that the question is not properly before us because Alabama Power has not filed a petition for reconsideration before the Commission. Brief for Respondents at 18 n. 17. We know of no such bar to review in this court of a final order of the FCC. The Administrative Procedure Act provides that "[e]xcept as otherwise expressly required by statute, agency action otherwise final is final ... whether or not there has been presented or determined an application ... for any form of reconsiderations...." 5 U.S.C. Sec. 704 (1982). The filing of a petition for reconsideration before the FCC is a prerequisite to judicial review only when the party seeking review was not a party to the original proceeding, or when the party "relies on questions of fact or law upon which the Commission ... has been afforded no opportunity to pass." 47 U.S.C. Sec. 405 (1982). Neither of these circumstances is applicable here
 
 
 [13]
 The legislative history defining the maximum rate as a proportionate share of the expense, "irrespective of the CATV attachment, of owning and maintaining poles," Senate Report at 19-20, may call into question the elimination of the other items that were subtracted from gross pole investment on the grounds that they were not "cable-related." The question is not whether the investments were cable-related, but whether they were pole-related, as the entire figure for gross pole investment would seem at first glance to be. However, we cannot determine from the record what precise costs were excluded as non-cable-related pole investments, and it may be that the account includes expenses that do not all reflect the cost of "owning and maintaining poles." Since guys and anchors were the only excluded costs challenged by Alabama Power, they are the only ones we examine here
 
 
 [14]
 The claim has not been made in this case, and therefore we have not considered, whether requiring the cable company by contract to provide and install the guys and anchors necessary only for the cable installation imposes upon the cable company a cost that should be considered part of the "rate" whose maximum is described by Sec. 224(d)(1)
 
 
 [15]
 These other accounts were: outside services, property insurance, injuries and damages, employee pensions and benefits, franchise requirements, duplicate charges credit, miscellaneous and advertising expenses, rents, and maintenance of general plant
 
 
 [16]
 The validity of the latter two formulae would depend on a determination by the Commission that the percentage of pole investment spent on administration was roughly the same as the percentage of cable-related investment (if the second formula were used) or of plant investment overall (if the third formula were used). If such a determination were made, use of the third formula would free the Commission from the necessity of deciding which administrative accounts were sufficiently pole-related to be included
 
 
 [17]
 Refunds were ordered retroactive to the date of the filing of the complaint. Bureau Order at 10, J.A. at 160. Therefore, the period to which the Commission applied the 9.97% rate of return is the period for which the Alabama Supreme Court has held that a rate of return on equity below 15% would be confiscatory